STATE of Minnesota, Respondent,

v.

James Dean STEWART, Appellant.

No. 47072.

Supreme Court of Minnesota.

Feb. 9, 1979.

C. Paul Jones, Public Defender, Phebe S. Haugen and Jim Morrow, Spec. Asst. Public Defenders, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., Thomas L. Fabel, Deputy Atty. Gen., Jane Prohaska, Sp. Asst. Atty. Gen., St. Paul, John M. Lundblad, County Atty., Jackson, for respondent.

Heard before ROGOSHESKE, KELLY, and TODD, JJ., and considered and decided by the court en banc.

TODD, Justice.

James Stewart was convicted of first-degree murder. He challenges the sufficiency of the evidence to establish premeditation and intent, the failure of the trial court to submit third-degree murder, improper admission of character evidence, improper remarks by the trial court to the panel of prospective jurors, and the shackling of defendant during the trial. We affirm.

■ 1–2. A detailed statement of the crime is not essential to our disposition of the case. We have reviewed the record and find no merit in Stewart's contention that there was insufficient evidence to sustain the finding by the jury of premeditation and intent as essential elements of the first-degree murder conviction. The evidence is overwhelmingly in support of his guilt.

■ Further, we find the trial court properly refused to submit to the jury the lesser included offense of third-degree murder. The evidence indicates that Stewart quickly shot the gun twice at the victim and then stopped shooting. There were no bullets fired at anything or anyone else. The only other person in the vicinity, Stewart's companion, testified she was not concerned for her own safety at the time of the shooting. Thus, there is no rational basis for a conclusion that Stewart's actions were eminently dangerous to more than one person as is required for an instruction of third-degree murder under Minn.St. 609.195(1). See, *State v. Hanson,* 286 Minn. 317, 325, 176 N.W.2d 607, 614 (1970). See, also, *State v. Nesgoda,* 261 N.W.2d 356 (Minn.1977).

3. Stewart claims that the trial court erred in two respects concerning evidence of a threatening letter written by defendant to the prosecutor. First, he argues the evidence was inadmissible and therefore the trial court erred by allowing the prosecutor to elicit testimony from him on cross-examination concerning the letter. Second, even if the evidence is admissible, Stewart claims a limiting instruction should have been given by the court sua sponte.

■ With regard to the issue of admissibility, it is reasonably clear from the discussion between the judge and the attorneys that the evidence of the letter was introduced for the purpose of showing defendant's character, although the state argues it also goes to the defendant's credibility. It is a well-established rule that evidence of the defendant's character is not admissible unless defendant has placed his character in issue. E. g., *State v. Martin,* 256 N.W.2d 85 (Minn.1977) (per curiam); *State v. Sharich,* 297 Minn. 19, 209 N.W.2d 907 (1973); *State v. Gress,* 250 Minn. 337, 84 N.W.2d 616 (1957). The record indicates that Stewart did place his character in issue by eliciting detailed testimony from his girlfriend concerning his nonviolent nature.

Even if such evidence did not indicate that Stewart placed his character in issue, any error in allowing the evidence of the letter was relatively harmless and therefore not grounds for reversal.[1] The prosecutor's cross-examination of defendant concerning the letter was very innocuous:

"Q. [By prosecutor] Back in December of 1975 did you have an occasion to write to me as county attorney, write a letter to me?

"A. December of '75?

"Q. Yes.

---

1. See, generally, Nordby, *The Craft of the Criminal Appeal,* 4 Wm. Mitchell L.Rev. 1, 26.

"A. Yes, sir.

"Q. And in that letter did you indicate to me that you were going to have to take measures against me to assure me that you wouldn't be prosecuted for that crime?

"A. What do you mean?

\* \* \* \* \* \*

"Q. In that letter did you indicate to me that you would have to take whatever measures were necessary to prevent me from prosecuting you in this case?

"A. Yes, sir. I did.

"Q. And that you, I could count on you to do whatever was necessary to remove me from that position of prosecuting you?

"A. I don't know if it was in them exact words, but I think so, yes.

"Q. And that you just wanted to return to your southern soil?

"A. Yes, sir."

The county attorney then brought to the jury's attention the fact that appellant had also written a letter of apology:

"Q. [By prosecutor] Did you, a week or so later also write me a letter in the form of an apology?

"A. Yes, sir.

"Q. And in that letter you had thought about it and indicated that you felt terrible about what you had written to me?

"A. Yes, sir. I did.

"Q. And you were angry at the position you had put yourself in and you took your hostilities out on me?

"A. Yes, sir. Not hostilities but anger.

"Q. You indicated that you knew that it was childish, to say the least?

"A. Yes, sir."

Admission of such testimony was not sufficiently prejudicial to constitute reversible error.

■ Turning to the next issue, defendant claims that even if the evidence was admissible, the trial court erred by not giving a limiting instruction that the evidence could only be used to assess the credibility of the defendant. We reject this argument because we have consistently stated that character evidence may be used to assess guilt as well as credibility. See, *State v. Demmings,* 310 Minn. 152, 246 N.W.2d 31 (1976); *State v. Hutchison,* 121 Minn. 405, 141 N.W. 483 (1913). Hence, a limiting instruction would have been improper.

■ 4. At the commencement of jury selection, the prosecution and defense joined in a request that the public be excused from the courtroom during the voir dire examination, and the court so ordered. After four jurors had been selected, the media asked the trial court to lift the ban on the public. This request was refused. The media, under Rule 25.01, Rules of Criminal Procedure, appealed to this court and we ordered the voir dire proceedings open to the public. When the trial court proceedings were recommenced, the trial judge made certain inappropriate remarks to the jury panel, criticizing the decision of this court. No objection was made at the time by defense counsel. The remaining jurors were impaneled. At a post-trial motion, an allegation of error was made, claiming these remarks prejudiced the defendant because of the chilling effect of these remarks upon the jury panel as to their answers to questions put to them at voir dire. We have examined the transcript of the voir dire proceedings and conclude that the remarks of the trial court did not have any adverse effects on the prospective jurors or infringe upon the defendant's right to have a fair trial by impartial jury. However, we do note that comments by the trial judge, criticizing this court's decision, made to prospective jurors during the course of litigation, have no place in our system of jurisprudence.

5. The most difficult issue in this case concerns the shackling of Stewart during voir dire and trial. On October 23, 1975, Stewart was indicted on charges of first-degree murder and aggravated robbery. He pled not guilty. At Stewart's request, the trial court ordered a psychiatric examination pursuant to Rules 20.01 and 20.02,

Rules of Criminal Procedure. On November 24, 1975, Stewart was confined at the Minnesota Security Hospital at St. Peter for purposes of the examination. On December 11, 1975, the trial court ordered his continued confinement at St. Peter pending trial because the psychiatric report indicated suicidal tendencies. However, on February 27, 1976, the trial court ordered Stewart's transfer to the county jail because of space limitations at the state hospital.

On December 10, 1975, while he was at the St. Peter hospital, Stewart wrote a threatening letter to the county attorney. The letter stated:

"Re: Get off my back.

"My Dear Mr. Lundblad,

"I was hoping that it would not be necessary for me to take drastic steps in arresting the possibility that you would not prefer to go on ahead with your phoney charge's on me. But I see now your true to life color is yellow. You are a pompus cocksucker—sir. You have no concern for human life and are an animal of an entirely disordered Breed. I see I must take measure's to assure me against prossication and there fore I assure you I will kill you if you proceed to take me through Court. I'm not a murderer in the true word, but I like any man will take the necessary step's to distroy a dangerous beast such as you are.

"What on Earth give's you the right to put my life on the line and try to place me in prison for life? Have you a misiah complex you know like God? Sir—in you the Devil himself would feel ashamed. Your Cesspool mind is so stagnated and foul only a decrepit reprobate like yourself could stomach you. You try me and you can count on me putting you out of commission. Don't fuck with me Mr. County Attorney, put me, just release me and let me return to my Southern Soil.

"Respectfully yours,

"James D. Stewart"

Subsequently, on December 22, 1975, Stewart sent a letter of apology to Mr. Lundblad. It stated:

"Dear Sir:

"Quite a nasty, letter I wrote and mailed to you wasn't it? It was a shame to do it, but matter of factly it was about me that the nature of the letter was composed. I'm now feeling like HE double L, and have ever since I wrote that thing. I want to make an appology to you not only because it was wrong, but I'm totally scared of what a letter of that nature could do to my pending case. I wish I could withdraw my word's to that letter:

"I was just angry at the position I have placed myself in and took my hostility out on you. I know it was really childish of me to say the least. Sir I can't sleep anymore at night, I'm losing my awareness of my society around me, I wish I could just lay down, close my eye's and die, Sir I can not make it in prison there is much to dope in that place. Homosexual's by the dozen's, I want to change my horrible life style I've been living, Sir I'm sorry, but I will kill myself before I go to prison, that prison can't help me, but this place can, Sir I'll do my time here please Sir for god's sake please let me please. Sir my Mother would die if I got prison time So please Sir help me, please help this Poor excuse of a man,

"thank you

"truthfully yours

"James dean Stewart"

In late December 1974, Dr. Delmer Eggert and Dr. Roger Sweet, the examining psychiatrists, submitted their reports to the court. Dr. Eggert's report states in part:

"* * * In my opinion, James Dean Stewart is not mentally ill. Regardless of that, I wish to comment on his capacity to understand the proceedings against him and participate in his defense, and on other matters. He is able to understand the proceedings against him. There is some distortion regarding the prosecuting attorney at present. He might become vocal or get out of order in court. He has threatened the prosecutor and has even done so in writing. I have no doubt that physical security can be provided in the

courtroom but it would not surprise me if the defendant became disorderly. * *

"In my opinion, there are homicidal tendencies. There may be several reasons for this. One is that he places a low value on his own life and he tends to value the lives of others similarly. Secondly, the value of another's life is rather minimal compared with his own wishes. Thirdly, as we are observing at present, he may tend to explain his difficulties as a result of someone else not liking him and as he has written, this is sufficient for him to threaten the life of the other person. In my opinion, there is a strong likelihood that he will engage in seriously harmful conduct."

Dr. Sweet's report stated in part:

" * * * During this interview, the accused made various threats against the prosecuting attorney and alluded to certain things that he would do once he got into the courtroom. He reported being unable to remember very much about the robbery-homicide, even though he has put in his own handwriting a fairly detailed version of the offense. Inspite of his being in a highly agitated and depressed state, there was nonetheless little or no evidence of any remorse about the death of the victim. (i. e. 'I don't remember shooting him, fuck, I don't even remember killing him. Minnesota is going to make an example of me and fuck me over. I won't let them and they are going to find out on court day.' 'All my life I asked for help and never got it.' 'I am the way that I am because people made me that way.')

\* \* \* \* \* \*

" * * * Because of the transient nature of these reactions and because Mr. Stewart should, at this time, be considered dangerous to himself and others, any further determinations of mental illness will have to be made by personnel having more frequent and daily contact with this individual."

On April 13, 1975, Stewart appeared in court for trial. Prior to selection of the jury, the following took place upon the record:

"MR. BUNDLIE: Thank you, Your Honor. Your Honor, I do have some pretrial motions. Number one, as the Court will observe, the defendant is in custody. He is presently, at this moment, in handcuffs, and I would move at this time that at all times that the defendant is exposed to the jury or the jury panel that the handcuffs be removed. I have no knowledge, indication or belief whatsoever that the defendant is going to cause any disturbance in the courtroom and I think it would be extremely prejudicial to his defense to appear to a jury or jury panel in handcuffs. Besides that, I would like him to be able to help me out at the counsel table by giving him paper and pencil to help make notes.

"THE COURT: Is there any reason that you know of, Mr. Lundblad, why that request should not be granted?

"MR. LUNDBLAD: Well, yes, two reasons. The first one is that Dr. Eggert or Sweet, I don't remember which, the examining psychiatrist or psychologist, indicates that the defendant has indicated that he will raise cane, or words to that effect, in the courtroom if he's brought to trial; and the other thing is that, I don't know if it's in the court file or if you're aware of it, but the defendant made a personal threat to me for which he later apologized by letter, but I think the exhibition of those threats sufficient that the courtroom decorum would require that he be secured by handcuffs which would outweigh the potential damage or prejudice to his case. He's been charged with first degree murder. If anything is more prejudicial to a defendant than that, I don't know what is. I don't think handcuffs are going to add to that prejudice. For that reason I would request that the defendant remain handcuffed even in the presence of the jury. It's not going to be that prejudicial and attention-getting from the jury. There are going to be plenty of other things that the jury is going to be attendant upon.

**58**

"THE COURT: Could he be shackled in some other way so his hands would be free to write?

"MR LUNDBLAD: I don't know about that. You mean, by legs or feet or something?

"THE COURT: Yes, to the chair.

"MR. LUNDBLAD: I don't know. That would be something that the law enforcement people would have to be, you know, have the capacity to do. I don't know if they have cuffs for ankles or how they would handle it.

"MR. BUNDLIE: Your Honor, the defendant has asked if he would be allowed to say something to that point.

"THE COURT: Yes, you may.

"THE DEFENDANT: At the time of the letter that I wrote to Mr. Lundblad I was feeling depressed and personal matters that happened between me and Dani Price. I was putting the blame on him and not myself and I, for raising cane in court, I wouldn't have no reason to. I'd like to just get this over with and I have no personal feelings towards Mr. Lundblad or the Court or anybody and as far as hostile, I haven't been hostile. If I would want to raise cane, I would raise it with the jailers at the jail I'm in and they would tell you, they could testify that I don't cause no disturbance whatsoever.

"MR. BUNDLIE: I think, Your Honor, that he deserves a chance to show that he can behave himself and will behave himself in the courtroom. There will be people present, deputy sheriffs, also, and I don't think that there is going to be any danger.

"THE COURT: Well, I think that we should check with the sheriff and see what security arrangements he has and I would just as soon have it in such a way that he can write and take notes and so forth, which he should have a right to do, and I don't know whether he can do it that way, not very well.

"THE DEFENDANT: Can I say something to the Court?

"THE COURT: Yes.

"THE DEFENDANT: Well, about two weeks ago I was took to the doctor and Nobles County, I think that's the county and the sheriff there, he didn't handcuff me or he didn't—well, he didn't handcuff me or nothing or shackle me down. He took me to a doctor and I think that, well, when he took me to the doctor and he went in the doctor and left me in the visiting room to see the doctor by myself and if I'd had any intention of raising cane or leaving or trying to escape, I could have walked right out of that, but I realize how serious this crime is and I don't want to add anything to it.

"THE COURT: Well, if you wish, Mr. Bundlie, you can have the sheriff tell me what he feels about it.

"MR. BUNDLIE: Certainly.

"THE COURT: I think that at this point I would not grant your motion as of now but if you wish to have the sheriff tell me on the record as to what his feelings—after all, it's their ultimate responsibility to maintain the security of everyone in the courtroom and I think we should hear from them.

"MR. BUNDLIE: I wonder if the sheriff of this county—I don't think the sheriff of Nobles County is present.

"MR. LUNDBLAD: No. I'm sure he's not. I think only the deputy from that county is here.

"THE COURT: But we can do that tomorrow, too. We can start selecting the jury as is for today.

"MR. BUNDLIE: Well, Your Honor, the defendant will be in the courtroom in handcuffs when the jury comes in. I wonder—

"THE COURT: I don't feel there's sufficient—in light of what the county attorney has told me, and the defendant has admitted the act, and I don't believe that without anything more I should change what we have now. I think that the sheriffs are responsible for security and I should have something from them as to what they believe is necessary to maintain security in the courtroom, as well as their experience with the defendant.

"MR. LUNDBLAD: Your Honor, if I might, I could get the sheriff at noon and have him here just prior to going in to pick the jury. He could talk to you about it.

"THE COURT: If you want somebody from Nobles County, you would have to make arrangements for that.

"(Off-the-record discussion.)"

Also at this time defendant personally apologized to the county attorney and shook hands with him.

On April 30, 1975, following selection of a jury, but prior to the submission of any evidence, the following occurred on the record:

"MR. BUNDLIE: Your Honor, I have one further motion and that is, I'd like to renew my motion to have the defendant freed of restraints while he's in the courtroom. We've gone through three weeks now; this is the end of the third week of proceedings in this case. There's been no indication shown that restraints are necessary. I don't believe that they are and I think that having the defendant handcuffed to his chair while he's in the courtroom cannot help but have an adverse effect upon the jurors relative to the guilt or innocence of this defendant. I believe that this unduly prejudices the defendant and forms the basis for a denial of a completely fair trial.

"THE COURT: Mr. Lundblad.

"MR. LUNDBLAND: Your Honor, the fact that nothing has happened during the last three weeks with regard to any security problems may be because of the reason that the defendant has been handcuffed to the chair. No one knows that. I think on behalf of the sheriff of Jackson County and the security of the courtroom that the motion should be denied and I believe we've made our arguments previously and I'm sure the Court recalls the reasons for the basis for the state's motion or objection to defendant's motion.

"THE COURT: The Court would have to say again that on the basis of materials submitted to it by counsel to consider before ruling on the motion of the offer to plead to second degree that the information contained there leads the Court to believe that your motion should be denied, Mr. Bundlie. That's the only information that I have to go on. It's medical information, as you know, and I feel that I have to rely on that at this time. Your motion is denied."

The reports referred to by the trial court are the medical reports of Dr. Eggert and Dr. Sweet.

Pursuant to trial court order, Stewart was handcuffed to the chair during the trial. As a result, he was the only person in the courtroom not to rise each time the judge entered or exited through the many weeks of trial. When defendant testified, his wrists were handcuffed together so that when he took the oath to testify, he had to raise both hands. After being sworn, he was then handcuffed to the witness chair.

During the course of the trial, defense counsel did not request any instructions that the jury was not to consider the handcuffing of defendant in assessing the proof or determining guilt or innocence. Nor did the trial court offer such an instruction sua sponte. Following the return of a guilty verdict, Stewart's counsel made various post-trial motions. In its memorandum accompanying the order that denied the motions, the trial court stated in part:

"In this memo the Court will only refer to one issue raised by the defendant, the handcuff issue, as the other objections by the defendant are clearly without merit.

"The Court based its decision to require that the defendant be handcuffed during all stages of the trial and proceedings in connection therewith because:

"1. There was overwhelming evidence of his guilt of a homicide in some degree.

"2. Medical reports. The opinion of the doctors was that the defendant was potentially dangerous as he felt no remorse for his act. That he has homicidal tendencies, he places a low value on his own life and tends to value the lives of others similarly. That the value of another's life is rather minimal compared to his own wishes. The doctor expressed an

opinion that he will engage in seriously harmful conduct, that he may become vocal or get out of order in court.

"3. That he verbally and in writing threatened the life of the prosecuting attorney.

"4. That during the trial the sheriff and deputy sheriffs charged with the duty of holding defendant in security reported at various times of his bizarre behavior while in custody, to-wit: (a) that he shaved the front part of the hair off his head and then demanded a wig; (b) that at one time he refused to leave the jail to go to court; (c) that he made sexual advances to other male prisoners in the county jail.

"5. That the size and plan of the courtroom was such that the defendant was in close proximity to members of the jury, defense counsel and the public.

"6. The defendant was a well-built young man and appeared to be physically powerful. (After the defendant was sentenced and was being removed from the courtroom, he attempted to break away from the deputy who had him in custody and a scuffle ensued requiring three deputies and the sheriff to control him on the floor until he could be further shackled. This is ample evidence of his strength and propensity.[)]

"It should be noted also that during the jury voir dire, during which time the defendant was shackled to his chair at counsel table, defense counsel made a special effort by inquiring as to each juror as to whether or not there was anything about the defendant and his situation, his looks or condition that would influence them in any way in their decision of guilt or innocence. Each juror eventually selected indicated to the negative to such questions."

On this record, Stewart claims he was denied his constitutional guarantee of a fair trial. He also claims the court should have instructed the jury sua sponte that the restraints should not be considered in assessing the evidence and determining guilt.

Turning to defendant's first claim, the fact that the evidence overwhelmingly demonstrates his guilt does not deprive him of a right to a fair trial. See, e. g., *State v. Mastrian,* 285 Minn. 51, 75, 171 N.W.2d 695, 710 (1969), certiorari denied, 397 U.S. 1049, 90 S.Ct. 1381, 25 L.Ed.2d 662 (1970). The leading decision concerning permissible restraint of a criminal defendant in the courtroom is *Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). In that case, the defendant was charged with armed robbery and desired to defend himself. Counsel was provided in the courtroom to assist him. The defendant refused to respond to the trial court's direction regarding his conduct. He threatened the judge. The trial court ordered him removed from the courtroom. The trial court advised the defendant he could return to the courtroom if he promised to properly conduct himself. At the close of the state's case, the defendant agreed to abide by the court's directions and was present during the presentation of his defense. He was convicted and the conviction was sustained by the Illinois Supreme Court. Thirteen years later, he sought a writ of habeas corpus from the Federal court based on his removal from the courtroom. The district court declined to issue the writ, but the court of appeals, in a divided opinion, reversed the district court and issued the writ. The United States Supreme Court reversed and denied the writ.

In commenting upon the applicable law, the court held that the right of confrontation of witnesses under the Sixth Amendment could be lost by a criminal defendant by consent or misconduct. Further, the court said there are at least three constitutional ways for a trial judge to handle an obstreperous defendant: (1) Bind and gag him, thereby keeping him present; (2) cite him for contempt; and (3) take him out of the courtroom until he promises to conduct himself properly. The *Allen* decision has been the subject of numerous legal

commentaries,[2] many of them critical.[3] The *Allen* decision seems to grant unrestricted discretionary powers to the trial judge while acknowledging that the constitutional rights of the defendant are being infringed upon. *Allen* does not set forth in detail the standards to be applied or the circumstances which permit their application. The instant case is particularly illustrative of the problem, since there has been no overt act by the defendant at trial, but medical opinion indicates the probability of overt action.

 This court has also considered the issue of permissible shackling. In *State v. Coursolle,* 255 Minn. 384, 389, 97 N.W.2d 472, 476 (1959), our court said:

"It is recognized * * * that it is within the discretion of the trial court to have a prisoner shackled when it is manifest that such a precaution is necessary to prevent violence or escape. In exercising its discretion the court must have some reason based on the conduct of the prisoner at the time of the trial to authorize so important a right to be forfeited. In other words, there must be some immediate necessity for the use of the shackles."

More recently, in *State v. Jones,* 311 Minn. 176, 247 N.W.2d 427 (1976), this court held that the defendant's conduct had resulted in a waiver of his right to be free of restraints, but we strongly discouraged the use of restraints and stated that the trial court judge should order the least coercive restraints reasonable under the circumstances. See, also, *State v. Kluck,* 299 Minn. 161, 217 N.W.2d 202 (1974); *State v. Klinkert,* 271 Minn. 548, 136 N.W.2d 399 (1965). Shackling, therefore, should be virtually a matter of last resort. We also recognize, however, that the threat of contempt procedures in a criminal trial seems to be of little consequence. Moreover, although banishment from the courtroom may be preferable in some instances, the election of the trial judge to use restraints instead of banishment is not in itself grounds for reversal.[4]

 Finally, we must consider Rule 26.03, subd. 2, Rules of Criminal Procedure:

"a. During the trial the defendant shall be seated where he can effectively consult with his counsel and can see and hear the proceedings.

"b. An incarcerated defendant or witness shall not appear in court in the distinctive attire of a prisoner.

"c. Defendants and witnesses shall not be subjected to physical restraint while in court unless the trial judge has found such restraint reasonably necessary to maintain order or security. If the trial judge orders such restraint, he shall state his reasons on the record outside the presence of the jury. Whenever physical restraint of a defendant or witness occurs in the presence of jurors trying the case, the judge shall on request of the defendant instruct those jurors that such restraint is not to be considered in assessing the proof and determining guilt."

This rule states the general procedures used in ordering restraints. However, we note that it fails to fully express our position that (1) restraints should not be ordered unless eminently necessary, and (2) once this necessity has been shown, only those restraints which are reasonable and least coercive under the circumstances should be imposed. Moreover, it is preferable if the trial court gives a warning and uses sanctions of increasing severity prior to the imposition of restraints. Such warning and sanctions will assist the trial court in assessing eminent necessity for restraints. Conversely, the absence of such warning and sanctions may indicate the trial court did not have a sufficient basis for its decision that restraints were eminently necessary.

---

2. Comment, 84 Harv.L.Rev. 90; Note, 56 Minn. L.Rev. 699; Note, N.W.L.Rev. 671; Note, 46 N.Y.U.L.Rev. 120; Comment, 24 Okla.L.Rev. 72. See, also, 38 Tenn.L.Rev. 440; 39 U.Cin.L. Rev. 350; 23 Vand.L.Rev. 431.

3. See, Comment, 84 Harv.L.Rev. 90; Note, 56 Minn.L.Rev. 699; Note, 46 N.Y.U.L.Rev. 136.

4. We note, however, that in *State v. Jones,* 311 Minn. 176, 185, 247 N.W.2d 427, 432 (1976), the dissenting judge strongly advocated the use of banishment rather than restraints.

With these considerations in mind, we turn now to the question of whether the trial court judge properly exercised his discretion by shackling Stewart. Our inquiry is made with close scrutiny, for Stewart's fundamental constitutional rights to a fair trial are being delicately balanced against the necessity of courtroom security and order.

We turn first to the basis for the trial court's decision to shackle Stewart. Six reasons were given in the trial court's memorandum to defendant's post-trial motions. We are limited to consider, however, only those grounds appearing on the record at the time of shackling or time of subsequent rulings by the court made in response to motions at trial to have the restraints removed. Although the reasons for shackling need not be based on evidence introduced at trial, the defendant must be given an opportunity to challenge the reasons for shackling. See, *United States v. Samuel,* 431 F.2d 610 (4th Cir. 1970), affirmed on appeal after remand, 433 F.2d 663 (4 Cir.), certiorari denied, 401 U.S. 946, 91 S.Ct. 964, 28 L.Ed.2d 229 (1971); *State v. Moen,* 94 Idaho 477, 491 P.2d 858 (1971); *State v. Tolley,* 290 N.C. 349, 226 S.E.2d 353 (1976). This is implicit in Rule 26.03, subd. 2(c), which requires the judge to state his reasons for shackling on the record outside the presence of the jury.

Within the scope of the rule we have defined, we must limit our consideration of the shackling order to the reports of the psychiatrists, the letters of the defendant, the statements of the defendant made to the court at the time of the original motion, and the reasons articulated by the trial court at the time of the motion to support its denial of the defendant's request to be unshackled. Stewart claims these factors afford no basis for shackling because none concern actual misconduct during the trial. We subscribe to the view that the trial judge need not wait for some event to occur in the courtroom before imposing restraints. See, e. g., *Loux v. United States,* 389 F.2d 911, 919 (9 Cir. 1968); ABA Standards, Trial By Jury, p. 96 (Approved Draft, 1968). The "immediate necessity" for restraints, required by our *Courselle* decision, may exist because of inferences from attributes of the defendant or his prior conduct.[5] In *State v. Jones, supra,* we held that restraint could be imposed on a defendant who threatened courtroom misconduct, even though the actual misconduct did not occur.

The trial judge in the instant case was confronted with an extremely difficult decision. The medical reports strongly suggested the possibility of violence at trial. The examining doctors stated that Stewart had homicidal tendencies, placed a low value on the lives of others as well as his own life, made threats during the examination of what he would do in the courtroom, and was dangerous to himself as well as others. Most persuasively, Dr. Eggert stated: "* * * In my opinion, there is a strong likelihood that he will engage in seriously harmful conduct." The defendant had also made a threat on the life of the prosecutor, stating: "* * * I assure you I will kill you if you proceed to take me through Court." The trial court had also properly considered the fact that the nature of the charge was very serious—first-degree murder—and that Stewart had admitted the shooting. Weighing all of these considerations against the important constitutional

---

5. A good statement of some of the factors which a court might consider in determining the necessity of restraint appears in *State v. Tolley,* 290 N.C. 349, 368, 226 S.E.2d 353, 368 (1976): "The 'material circumstances' which the trial judge may consider in exercising his sound discretion include, inter alia, the seriousness of the present charge against the defendant; defendant's temperament and character; his age and physical attributes; his past record; past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self-destruction tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and mood of the audience; the nature and physical security of the courtroom; and the adequacy and availability of alternate remedies." Accord, *People v. Sullivan,* 48 Ill.App.3d 787, 792, 6 Ill.Dec. 462, 466, 362 N.E.2d 1382, 1386 (1977); *People v. Boose,* 66 Ill.2d 261, 266, 5 Ill.Dec. 832, 834, 362 N.E. 303, 305 (1977).

right of the defendant to a fair trial, we conclude that the trial court did not abuse its discretion in concluding that Stewart was dangerous and that restraints were necessary to protect the security and order of the courtroom. We arrive at this conclusion even though the trial court did not utilize a warning or increasingly severe sanctions. In arriving at this conclusion, we also have specifically declined to consider the reasons given by the trial judge in support of his order at the posttrial motions, other than those which appeared on the record at the time shackling was ordered.

We also conclude that the trial court ordered only those restraints reasonable under the circumstances. Stewart was seated in the courtroom and restrained to his chair before the jury entered. In addition, the restraint generally consisted of one handcuff or shackle, placed in a manner such that defendant was allowed to take notes and converse with his attorney. These restraints were reasonable under the circumstances.

With regard to the issue of shackling, Stewart's second claim is that the trial court judge erred in not instructing the jury, sua sponte, that his restraint should not be considered in assessing the proof and determining guilt. We note that under Rule 26.03, subd. 2(c), Rules of Criminal Procedure, the decision to instruct the jury on the use of restraints is left with defense counsel. We believe this to be the better rule since any imposition of a requirement of sua sponte instructions by the trial court transfers the trial strategy from defense counsel to the trial judge. See, *Patterson v. Estelle*, 494 F.2d 37 (5 Cir.), certiorari denied, 419 U.S. 871, 95 S.Ct. 130, 42 L.Ed.2d 110 (1974); *State v. Cassel*, 48 Wis.2d 619, 623, 180 N.W.2d 607, 612 (1970). Since no instruction was requested by defense counsel, there is no error in not instructing the jury as to the consideration of restraints.

Affirmed.

OTIS, Justice (dissenting).

Granted there was medical evidence that this defendant was dangerous and homicid-al, the same may be said for the majority of habitual offenders charged with acts of violence. Yet shackling is virtually unheard of where the defendant has committed no overt disruptive act in open court. I cannot subscribe to a rule which permits shackling on such speculative premises as were here assigned. It is inconceivable to me that one unarmed defendant, guarded continuously by one or more deputy sheriffs, poses a serious threat to a courtroom crowded with jurors, court personnel, witnesses, lawyers, and spectators. The effect on the jurors of having the defendant's arms and legs shackled in their presence throughout the trial is tantamount to a judicial declaration that he is a dangerous person who, for the safety of the public, should be confined. It is difficult to imagine greater prejudice to one presumed to be innocent.

ROGOSHESKE, Justice (dissenting).

I join in the dissent of Mr. Justice Otis.

WAHL, J., took no part in the consideration or decision of this case.