**STATE of Minnesota, Respondent,**

v.

**Michael Albert WILLEY, Appellant.**

**No. C1–91–861.**

Court of Appeals of Minnesota.

Jan. 21, 1992.

---

Earl P. Gray, Earl P. Gray & Associates, St. Paul, for appellant.

Hubert H. Humphrey, III, Atty. Gen., and Tom Foley, Ramsey County Atty., Steven C. DeCoster, Asst. County Atty., St. Paul, for respondent.

Considered and decided by CRIPPEN, P.J., and NORTON and DAVIES, JJ.

## OPINION

DAVIES, Judge.

Appellant Michael Albert Willey was convicted of attempted murder in the second degree for shooting his former housemate. Willey asserts the trial court erred in excluding evidence of his intoxication, where such evidence was necessary to support his defense of accident. Agreeing, we reverse and order a new trial.

## FACTS

Katherine Ann Mootz met Michael Albert Willey in May or June of 1990. In July, Mootz rented an extra bedroom in Willey's home. She slept either in that separate bedroom or on the couch in the living room. Willey pressed his affection on her, but, though a friend, she did not desire a physically intimate relationship.

Eventually, Willey became morose over Mootz's insistence on keeping the relationship platonic. He often spoke with Mootz about his unrequited affections and his dire financial situation; this led him to tell her he was thinking of committing suicide. Though she never saw any preparations for suicide, Mootz worried about Willey. By late October, the pressure of her living arrangements became too great for Mootz and she moved out.

Mootz called Willey the night of November 5, 1990, to see how he was doing. Willey said he was despondent and was considering suicide. He asked her to come to his home to talk and she agreed. Allegedly, both Mootz and Willey consumed narcotics and alcohol throughout the next two days as they talked about Willey's situation. On both nights, Mootz slept on the living room couch while Willey, allegedly "wired" on drugs, claimed not to have slept at all either night.

Mootz testified that as she slept on a couch in the living room on the morning of November 7, she was awakened at 10:30 a.m. by the slam of the garage door. Mootz claimed Willey walked in from the garage and spoke harshly to her while she attempted to stand. Then she was shot. As she fell back into the couch, she saw Willey standing with a smoking revolver pointed at her. Mootz claims Willey agreed to call for help, but only if she agreed to say the shooting was an accident. She agreed, believing her life was in jeopardy. Willey then called 911.

Willey tells a different story. He claims that when Mootz fell asleep on the morning

of November 7, he tossed and turned, unable to sleep because of drug use. He drove to a store and, on his return, put his van in the garage and shut the door. At about 9:00 a.m. he decided, in response to nervous tension, "to get busy," so he went to clean up his basement. He claims that while cleaning he found a .38 caliber revolver that he had owned for 20 years, but had fired only once. A friend who borrowed it had returned the gun a month before, along with a box of shells.

Willey claims he cocked the gun unthinkingly, without checking whether it was loaded, and, excited to have found it, carried it upstairs to show to Mootz. Willey claimed he did not speak harshly, but rather walked toward the couch saying, "Katherine, look at this f . . . . . gun." When she sat up, the gun discharged "accidentally." Willey admitted that his finger was on the trigger when the gun discharged and that the gun must have been aimed at Mootz when it went off. He attributes the discharge to lack of coordination due substantially, or at least partially, to intoxication. There was, however, evidence that the gun had a heavy trigger.

Willey claimed to have been shocked when the gun went off and was not sure what to do. First, he threw the gun on a chair. Then he dialed 911, said the word "shotgun" (or "shot gun") and hung up. He ran to the garage, started the van, and left the motor running when he had trouble getting the garage door open. Returning to the living room, he called 911, this time stressing repeatedly that the shooting was an accident. The 911 calls were tape recorded and played for the jury.

When deputies and paramedics arrived, Willey met Deputy Sheriff James McNeely at the front door and led McNeely to the injured Mootz. While Deputy Darwin McVary concentrated on the victim, McNeely asked Willey to remove his growling dog. Following Willey to the closed garage to pen the dog, McNeely saw that the van was running, causing a very strong odor of exhaust in the garage. Willey turned the van off and removed the keys.

While Willey was still in the room, Mootz claimed she was afraid to say anything. Once Willey was removed to the sheriff's car, however, she immediately volunteered to Deputy McVary that Willey "shot me on purpose." Likewise she told a paramedic, "He shot me on purpose."

The police officers arrested Willey and seized the gun containing one spent round, four live rounds, and one empty chamber.

A bartender who spoke to Willey five days after the shooting testified that Willey told her he shot Mootz and that when the bartender asked Willey why he would shoot Mootz if he loved her so much, Willey replied, "The reason why may have been that it was a murder-suicide." Willey admits he said that "I accidentally shot Katherine," and prior to leaving he said "maybe it was a murder; maybe it was a suicide."

At trial, Willey did not offer the defense of intoxication, but rather depended on a theory that the shooting resulted from an accidental discharge. The trial court, over defense objection, granted the state's motion to limit the introduction of evidence of Willey's use of intoxicants preceding the shooting. Willey was convicted and sentenced to an executed term of 120 months in prison. A post-trial motion for a new trial was denied.

## ISSUE

Was appellant denied a fair trial when the trial court disallowed any testimony as to appellant's intoxication at the time of the shooting?

## ANALYSIS

■ The trial court granted the state's motion to preclude inquiry into Willey's intoxication, reasoning that such evidence should only be allowed to substantiate a traditional intoxication defense (to show diminished capacity to form intent) under Minn.Stat. § 609.075 (1990).[1] Because Wil-

---

1. An act committed while in a state of voluntary intoxication is not less criminal by reason thereof, but when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intox-

ley did not rely upon an intoxication defense, we agree with the trial court that intoxication evidence is immaterial here on the issue of intent or state of mind.

The evidence was not proffered to show lack of intent or diminished capacity, however. It was offered, instead, as key evidence to provide credibility for or to explain Willey's theory of discharge without intent—accidentally—through clumsiness or agitation.[2] Diminished mental capacity is different from diminished physical capacity, so Willey need not allege diminished mental capacity in order to use intoxication to give credibility to his defense of accidental discharge. No matter what impact intoxication had on his thinking, diminished physical capacity is probative of Willey's claim of clumsy accident.

The dissent gives an unreasonably literal reading to the first clause of Minn.Stat. § 609.075. The rest of that sentence, referring twice to "intent" and twice to "state of mind," makes clear that the concern of the section is mental disability from drunkenness, not its physical consequences. It is also relevant that in all previously reported cases involving this statute, the issue of intoxication has been linked to state of mind rather than physical control or coordination. *See, e.g., State v. Buchanan,* 431 N.W.2d 542, 549 (Minn. 1988); *State v. Hale,* 453 N.W.2d 704, 707 (Minn.1990).

A defendant in a criminal case must have "a meaningful opportunity to present a complete defense." *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984). Relevance is defined as

> having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Minn.R.Evid. 401. It is common knowledge that intoxicants impair motor skills and coordination. Such impairment renders the accidental firing of a firearm more probable than otherwise. Thus, the evidence of intoxication was relevant to Willey's claim of accident; it was erroneously excluded.

■ Evidentiary errors may require reversal where there is " 'a reasonable possibility' that the error complained of might have contributed to the conviction." *State v. Larson,* 389 N.W.2d 872, 875 (Minn.1986) (quoting *Chapman v. California,* 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967)). Regardless of the weight of the evidence against him, a criminal defendant cannot be deprived of his right to a fair trial. *State v. Stewart,* 276 N.W.2d 51, 60 (Minn.1979). Reversal is required because, in our view, the error might have contributed to the finding of guilt. This was the strongest evidence available supporting Willey's theory of defense. Contrary to the state's contention that this evidence would only confuse the jury, we believe it was essential to the jury's clear and complete understanding of the circumstances surrounding the pulling of the trigger.

There was other evidence such that a jury, even with the evidence of physical impairment, might reasonably have found Willey guilty of attempted second-degree murder. Yet, the impairment evidence is significant enough that its exclusion prejudiced Willey's defense. We cannot find the exclusion of this proffered evidence to be harmless error.

When there is a prejudicial error of law properly objected to at trial, the appropriate remedy is the grant of a motion for a new trial. Minn.R.Crim.P. 26.04, subd. 1. The motion was made by Willey, and we find it was an abuse of discretion to deny the motion.

Willey claims the trial court erred as well in allowing the admission of other testimony. There was, however, no objection to this testimony at trial. Failure to object at

---

ication may be taken into consideration in determining such intent or state of mind. Minn.Stat. § 609.075 (1990).

**2.** The dissent's suggestion that "this defense was not proposed to the trial court" is without basis.

The dissent is wholly correct, though, in stating that this defense is supported by no evidence in the record. Appellant was not allowed to put in such evidence. The issue is whether he should have been permitted to do so.

the time of trial may forfeit a defendant's right to appeal on these issues. *State v. Ture,* 353 N.W.2d 502, 516 (Minn.1984). For this reason, and because we find reversal appropriate on other grounds, we do not address Willey's additional assignments of error.

## DECISION

Evidence of defendant's intoxication is admissible to support a defendant's assertion that his or her intoxication contributed in a physical way to the occurrence of a shooting claimed to have been accidental.

Reversed and remanded for a new trial.

CRIPPEN, Judge (dissenting).

Neither the facts of this case nor the law governing it permit us to disturb these first degree assault and attempted second degree murder convictions. The trial court did not commit error, reversible or otherwise, in excluding evidence that appellant consumed alcohol or drugs before his criminal conduct occurred.

### 1.

Initially, we must respect the broad discretion of the trial court in its evidentiary decisions. *State v. Larson,* 389 N.W.2d 872, 874 (Minn.1986). The court's discretion was not clearly abused in the circumstances of this case.

### 2.

Evidence on appellant's accident theory is inadmissible under Minn.Stat. § 609.075 (1990). The statute permits intoxication evidence only on the element of an offense which states "a particular intent or other state of mind." Appellant does not challenge the particular identification of his intention as one to kill or harm his companion. Under the statute, intoxication evidence challenging appellant's general intent to shoot his companion is inadmissible.

Appellant's accident theory rests on a pretended distinction between proving the occurrence of an accident and disproving the general intent to commit a crime. This argument is offered with no supporting authority and it is not tenable. The theory of accident constitutes denial of a general criminal intent, and evidence on the subject is inadmissible under Minn.Stat. § 609.075.

### 3.

Equally important, appellant's accident contention constitutes his attempt to create an appellate issue that never surfaced during trial court proceedings. On appeal, appellant contends that intoxication evidence "was relevant to his defense that he was in a physical state in which it was highly probable that he would act in an uncoordinated or clumsy fashion and mishandle something he was holding." This defense was not proposed to the trial court, and the trial record includes no evidence suggesting that appellant acted clumsily or without coordination or that he mishandled the gun used to shoot Katherine Mootz.

The state's pretrial motion asked the court to bar appellant from offering evidence of intoxication and to preclude his attorney from cross-examining witnesses on that subject. In response, the defense acknowledged it was not asserting a defense of intoxication, but declared that the evidence "somehow explains as to why there was an accident." Counsel merely stated that the intoxication evidence "goes to indicating where the defendant and the victim were and their state of mind and their situation at the time the incident occurred." The state responded that "the only thing that differentiates an accident from the criminal act is the intention," adding that "the intention is not negated by alcohol." In granting the state's motion, the trial court observed that the intoxication evidence was "at the most" an offer to show "diminished capacity."

Coinciding with the imprecise offer of proof, the defendant at no time offered evidence showing that he was uncoordinated or clumsy when the shooting occurred, that he tripped or fell, or that he mishandled or fumbled the gun. He did not claim the gun malfunctioned. The record of his testimony shows the following pertinent questions and answers:

Q. OK. After that then what occurred?

A. I went upstairs, pushed the basement door open which hit the garage door. I then proceeded out the basement door and slammed the garage door shut because apparently I had left it open, and walked into the living room and said, "Katherine, look at this.... gun," and it discharged.

\* \* \* \* \* \*

Q. For what purpose were you going to show her the gun, Mr. Willey?

A. Because I just found it.

Q. You were excited about that?

A. No. Well, yeah, because I had forgotten I had it down there.

Q. Which is it, Mr. Willey? Were you not excited or were you excited?

A. I was excited, I guess.

Q. So, you wanted to share your excitement with Ms. Mootz who was sleeping on the couch?

A. Yes.

Q. Mr. Willey, you fired the gun that shot Katherine Mootz; is that correct?

A. Yes.

Q. And to do that, the gun was pointed in her direction; is that right?

A. Yes.

Q. And you pointed the gun in her direction; is that right?

A. I had it in my hand.

Q. How did you have it in your hand, Mr. Willey?

A. Like this.

Q. With your arm—

A. Katherine, look at this.... gun; I had my hand halfway up.

Q. And why did you do that, Mr. Willey?

A. Because that is the way I was holding the gun.

Q. Just happened to be holding the gun pointed at Katherine Mootz with your arm extended?

A. I didn't have it pointed at Katherine when I said, look at this.... gun. She sat up and it discharged.

\* \* \* \* \* \*

Q. Mr. Willey, your finger was on the trigger when the gun went off; isn't that right?

A. Yes.

Q. How did it happen to discharge the gun, Mr. Willey?

A. I have no idea. I don't know.

Q. What were you looking at when the gun went off?

A. I was looking toward Katherine.

Q. Were you looking and pointing your arm toward Katherine?

A. No, I had my arm up like this.

Q. So, you're looking at Katherine but you had your arm over here?

A. Yes.

Q. And the gun went off?

A. As I slammed the door, it came around to the left-hand side going into the living room and the gun discharged.

Q. It discharged while you were looking at Katherine, you said that; is that right?

A. Yes.

Q. You had your hand out like this to your side and you were looking at Katherine?

A. Yes.

Q. Katherine is in this direction, Mr. Willey, correct, and the gun is pointed over here?

A. Yes.

Q. You couldn't have struck her with the bullet, Mr. Willey, if you were looking in her direction?

A. I came around. She was on the couch. I was entering the living room which is where the couch is at.

Q. What happened?

A. And the gun discharged.

Q. Just happened to discharge?

A. Yes, after I said look at this.... gun.

This record establishes no basis for the argument now made by appellant. The concept of clumsiness is created solely for appellate argumentation.

4.

Finally, if the trial court's discretion was abused, "reversal is warranted only when the error substantially influences the jury to convict." *State v. Loebach*, 310 N.W.2d 58, 64 (Minn.1981). We cannot reasonably conclude that intoxication evidence would have altered the jury's verdict.

The victim's testimony is, of itself, sufficient to find guilt regardless of any evidence of intoxication. Additionally, the jury was presented with a letter of appellant stating that he was despondent due to the victim's failure to respond to his affection. Appellant repeatedly threatened suicide. In fact, when the police arrived, appellant's van was running in a closed garage. The evidence was uncontradicted that appellant cocked the trigger and was pointing the gun at the victim when it fired. A firearms expert testified the trigger pull on this particular model .38 caliber pistol is almost double that of a standard issue weapon of the same caliber. The expert stated this gun does not discharge unless the trigger is pulled or the weapon is subject to some extraneous force such as being thrown against a wall or dropped from a high place. Lastly, the jury heard testimony, never directly contradicted by appellant, that he had commented about shooting the victim in a "murder-suicide."

In all likelihood, intoxication evidence would be prejudicial to appellant's case. Evidence that a defendant used narcotics and alcohol is improper when used as character evidence and is commonly challenged by defendants on that basis. *See State v. Blair*, 402 N.W.2d 154, 156–57 (Minn.App. 1987). Rather than having the purported effect of explaining how intoxication led to an accident, it is more likely the evidence would explain to a jury how the seemingly rational man seen on the witness stand could commit the criminal act of shooting a woman he allegedly treasured.

Because I find no merit in appellant's proposition on intoxication evidence, nor on his other stated grounds for appellate relief, I would affirm the judgment of conviction.

I respectfully dissent.