# STATE v. RACHELLE SHARICH.

209 N. W. 2d 907.

July 13, 1973—No. 43432.

*Olkon & Olkon* and *Ellis Olkon,* for appellant.

*Warren Spannaus,* Attorney General, *George M. Scott,* County Attorney, and *Henry W. McCarr, Jr.,* Assistant County Attorney, for respondent.

Heard before Knutson, C. J., and Todd, MacLaughlin, and Olson, JJ.

O. RUSSELL OLSON, JUSTICE.*

Defendant appeals from a conviction for prostitution, a gross misdemeanor under Minn. St. 609.32, subd. 4(1). Defendant contends (1) that statements made to her parents after her release on an appearance bond were inadmissible since the state failed to give pretrial notice regarding its intention to introduce such statements into evidence; (2) that she was denied her constitutional right to a fair trial as a result of prosecutorial improprieties; and (3) that she was denied her constitutional right to equal protection as the result of discriminatory enforcement of the prostitution laws. The trial court denied defendant's motion for a pretrial hearing on the claimed discriminatory penal enforcement of the state prostitution law.

Officer Matthew Vincent of the Minneapolis Police Department's morals squad, at the instigation of an informant, Curtis Mohler, investigated prostitution on May 3, 1971, in the Dayton-Radisson Arcade. The informant at 10:30 p. m. introduced Vincent to Joe Connelly, a security officer at the arcade, who, according to Vincent's testimony, told the men to come back later when he would attempt to procure for them a girl. Officer Vincent testified that after their return to the arcade about 1:30 a. m. defendant propositioned them. Defendant denied this and stated that she had merely come to the arcade after a local bar had closed to ask Connelly to join her for a meal. About 3:15 a. m., some time after defendant left the scene, Connelly was arrested for procuring a prostitute. A short time later, upon

---

*Acting as Justice of the Supreme Court by appointment pursuant to Minn. Const. art. 6, § 2, and Minn. St. 2.724, subd. 2.

hearing of Connelly's arrest, defendant went to the courthouse to inquire about her friend and was herself arrested.

At trial, the prosecution asked a number of questions which were objected to by defense counsel. Among other things, defendant was asked on cross-examination whether she had been "tricking" in a number of United States cities, whether she ever had venereal disease, and whether she knew of her boyfriend's alleged reputation as a pimp. The prosecution introduced no evidence that defendant had been "tricking" in other cities. The state, over defense objection, introduced into evidence the opinion of a morals squad officer that defendant's boyfriend had the reputation of being a pimp. Defendant's parents testified as to certain statements made by defendant regarding her life style. The statements were made subsequent to her release on an appearance bond.

## I.

At the trial, the prosecution presented testimony from defendant's mother and stepfather in the nature of admissions by defendant against interest. While these statements were made after her arrest, they were not made while she was in custody but were made subsequent to her release on an appearance bond. The defendant apparently claims the admission of these incriminating statements violated her rights to notice and a pretrial hearing on admissibility under State ex rel. Rasmussen v. Tahash, 272 Minn. 539, 141 N. W. 2d 3 (1965), and that if such a hearing had been held, the statements would have been held inadmissible under Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L. ed. 2d 694 (1966). We do not agree. The rule in Miranda is designed to afford an individual who is "subjected to custodial police interrogation" his Fifth Amendment privilege against self-incrimination. 384 U. S. 439, 86 S. Ct. 1609, 16 L. ed. 2d 704. Defendant's statements were clearly made in a noncustodial setting, and any question of voluntariness separate from rights under Miranda does not appear to be involved.

## II.

At the trial, the prosecutor made the following inquiries and related offers of evidence:

(1) In cross-examining defendant, he inquired as follows:

(A) Whether defendant had made trips in the past 6 months to a number of cities such as Boston, Detroit, Chicago, Kansas City, and Philadelphia and whether she had been "tricking" in any of those cities. She responded in the negative. This inquiry may have been relevant; however the prosecution offered no evidence that she in fact had been "tricking" in any of these cities.

(B) Whether she had ever had "V. D." This was claimed admissible on the theory the defense had opened the inquiry with testimony that defendant had been hospitalized. This inquiry was irrelevant and prejudicial. The trial judge instructed the jury to disregard this question.

(C) How well she knew a certain girl named Tracy King and whether Tracy King was a friend of defendant's boyfriend, Burl Grigsby. The answer was in the negative. This inquiry was irrelevant and prejudicial. Previously, Officer Vincent had been allowed to testify that Tracy King had solicited him on the same evening on which he was introduced to defendant. The question appears to have been asked in order to permit the jury's inference that defendant's boyfriend was a "pimp" and that defendant therefore was a prostitute (or had the reputation for being a prostitute).

(2) In cross-examining Mr. Connelly, a defense witness, the prosecutor asked him if he had ever had sexual intercourse with defendant. This was apparently asked, over objection, on the tenuous theory (and for the "limited purpose" of tending to show) that the experience demonstrated bias on the part of the witness in favor of the defendant. This inquiry was irrelevant and prejudicial.

(3) Defendant on cross-examination had denied her boyfriend, Grigsby, was a pimp or that he had a reputation for being

a pimp. There then was admitted into evidence the opinion of a morals squad police officer that defendant's boyfriend had the reputation of being a pimp. This was done on the grounds that defendant's denial that she was a prostitute opened up that question.

The admissibility of evidence relating to defendant's character is carefully prescribed under our law. It is well settled that the prosecution may not attempt to establish the bad character of the defendant until the defendant has put that character in issue by offering evidence of good character. State v. McCorvey, 262 Minn. 361, 114 N. W. 2d 703 (1962); State v. Gress, 250 Minn. 337, 84 N. W. 2d 616 (1957). By voluntarily testifying in his own behalf, the accused opens up only the issue of his credibility, not his general character. State v. Gress, *supra.* A general denial by the defendant that he did a particular kind of act is insufficient to put his character into issue. State v. Flowers, 262 Minn. 164, 114 N. W. 2d 78 (1962) (I have never kicked, struck anyone); State v. Stockton, 181 Minn. 566, 233 N. W. 307 (1930) (I never robbed anyone). Furthermore, unless the defense offers evidence of good character, the state may not attack the defendant's character in respect to the trait involved in the crime alleged at bar. State v. Gress, *supra.*

Defendant here clearly did not put her character into issue. Defense witness Connelly was asked on direct if he knew defendant to be a prostitute; however, this question in itself did not serve to put her character into issue. Defendant did not offer affirmative evidence of her good character. Further, pursuant to the rule in State v. Flowers, *supra,* her mere denial that she was a prostitute or had prostituted herself on this occasion did not put her character into issue. The state does not and cannot contend that such questions were designed merely to attack defendant's credibility.

Additionally, the prosecution, like the defense, has a duty to refrain from disparaging the witness' character without supporting its questions, if denied, with admissible and competent

evidence. See, State v. Flowers, *supra*; State v. Gress, *supra*; State v. Silvers, 230 Minn. 12, 40 N. W. 2d 630 (1950). The court in Flowers noted that inquiries which assume the existence of damaging facts may be phrased in such manner and asked with such persistence as to impress the jury that an inference should be drawn as to their truth even though the defendant denies it and there is no other evidence to support it. Such inquiries are improper.

The rule of law is well established that an examining attorney who inquires into collateral matters on cross-examination, including those matters relating to the witness' credibility, is bound by the answers he receives. The cross-examiner is not permitted in collateral matters to prove facts contradicting the answers, even if they are false. State v. Gress, *supra*; State v. Silvers, *supra*. A matter which is collateral is by its nature irrelevant. Inquiry as to the reputation of defendant's boyfriend was clearly collateral to the issue of her activities on this particular night. Thus, the prosecution should not have been permitted to introduce independent evidence of the reputation of defendant's boyfriend.

The above recited inquiries (e. g., inquiries into character when the defendant had not put her character into issue, and insinuating inquiries as to relevant matters assuming the existence of highly damaging facts, and inquiries into collateral matters) were erroneous and constitute the basis for granting a new trial in this case.[1] The misconduct of counsel is unexplained, inexplicable, and inexcusable. As we recently pointed out, improperties on the part of defense counsel will not excuse similar improprieties on the part of the prosecution. State v. White, 295 Minn. 217, 203 N. W. 2d 852 (1973). However, a

---

[1] We note that the final arguments to the jury were not recorded either by the court reporter or by an appropriate electronic recording device. Claimed errors in final arguments therefore are not before us for review. Such arguments to the jury in a gross misdemeanor criminal case should be recorded.

careful reading of the transcript convinces this court that the excessiveness of the prosecutor's conduct in this case was not accompanied by undue zeal on the part of defense counsel.

## III.

State discrimination against individuals or groups is prohibited by the equal protection clause of the Fourteenth Amendment; where the state statute itself is discriminatory, it is readily struck down. However, the defendant makes a different claim in this case. She claims a discriminatory enforcement of a non-discriminatory law. Specifically, the defendant claims a discriminatory enforcement of the prostitution laws exists (on the policing level rather than the prosecution level) and that it has violated her constitutional right to equal protection.[2] Without reciting in detail all the claims which the defendant makes or the areas of claimed state activity which she maintains may be a basis for a determination that such a constitutional right has been denied her, we remand the case to the trial court for a hearing on this issue.

This court has previously ruled in State v. Anderson, 280 Minn. 461, 159 N. W. 2d 892 (1968), that, in the absence of purposeful discrimination, discriminatory enforcement does not exist in prostitution cases simply by the exercise of prosecutorial discretion to proceed under the state statute, which makes prostitution a gross misdemeanor, rather than under the city ordinance, which makes it a misdemeanor. The defendant in this case appears to claim, however, that there is discriminatory penal enforcement by the morals squad police officers based upon race and economic self-interests of selected bar owners.

We indicated (without holding) in State v. Anderson, *supra,* that "intentional and purposeful discrimination" in the enforce-

---

[2] The defendant's main brief appears to allude also to prosecutorial discrimination; however, defendant's rebuttal brief (p. 7) makes clear her claim: "The point appellant makes is not that the discretion of *prosecutors* is abused, but that the discretion is exercised at the *police level* entirely, by non-lawyers."

ment of penal laws under certain circumstances may constitute unequal protection of the laws. In State v. Vadnais, 295 Minn. 17, 202 N. W. 2d 657 (1972), such was the determination with respect to enforcement of penal laws prohibiting the parking of mobile house trailers within a township except in a licensed trailer court under circumstances where no trailer court was licensed in the entire township and others who had parked trailers and campers in the township were not prosecuted. We do not in this decision decide that an analagous discrimination exists or can exist with respect to the activity prohibited in a prostitution case.[3] That matter is not before us.

The trial court, on remand, should permit the defendant to offer evidence to support her claim of discriminatory penal enforcement at the law-enforcement level. The defendant should be permitted to offer such evidence at a pretrial hearing with witnesses subpoenaed, if need be, and without the prior requirement of affidavits from prospective witnesses, who defendant claims are identified with that alleged state discriminatory conduct; cross-examination of hostile witnesses may well be necessary if the trial court so determines. An adversary hearing at the trial court level is necessary before this court can properly assess the issue.

---

[3] In Silver v. City of Minneapolis, 284 Minn. 266, 170 N. W. 2d 206 (1969), a civil, rather than a criminal, case, we held that deployment of police and fire-fighting resources in the face of threatened and actual riotous circumstances constituted the proper exercise of a discretionary function at the administrative level and therefore the city was not subject to civil liability for its decisions relating to such deployment. It appears reasonably clear in the enforcement of criminal laws that selective allocation of available law-enforcement resources in a manner that concentrates those available resources where they will be most productive and helpful to the community it serves is clearly in the public interest. Such selective allocation in the public interest is not under attack in the immediate case. Rather, the defendant here claims discriminatory enforcement on the operational policing level based upon racial discrimination and the economic self-interests of selected bar owners.

We observe that seldom, if ever, does the issue of discriminatory penal enforcement arise in the area of antisocial crime in which an innocent third person or his property is involved, i. e., burglary, robbery, rape, murder, and the like. The question appears to arise most frequently in the area of so-called consensual crime, i. e., where the victim, if any, is largely and primarily the defendant instead of an innocent third person. This category of crime often includes gambling, nonaddictive drug cases, and prostitution. It has also arisen in cases involving Sunday closing laws and licensing. Mangold Midwest Co. v. Village of Richfield, 274 Minn. 347, 143 N. W. 2d 813 (1966). Whether or not the nature of the particular prohibited conduct should affect the constitutional right of equal protection of the laws is not easy to answer and we do not in this case decide.[4]

The defendant in this case should be heard by the trial court on the question of whether there has been, as to her, a discriminatory enforcement of a nondiscriminatory law.

Reversed and remanded for a pretrial hearing and new trial.

MR. JUSTICE YETKA and MR. JUSTICE SCOTT, not having been members of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

---

[4] Note, 59 Yale L. J. 354. See, also, Hall, Kamisar, LaFave & Israel, Supplement to Modern Criminal Procedure—Basic Criminal Procedure (3 ed.) (Jan. 1972), c. 14.