STATE of Minnesota, Respondent,

v.

Robert Wayne LOEBACH, Appellant.

No. 50237.

Supreme Court of Minnesota.

Sept. 11, 1981.

C. Paul Jones, Public Defender, and J. Christopher Cuneo, Asst. Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., and Gary Hansen, Sp. Asst. Atty. Gen., St. Paul, Jerome Schreiber, County Atty., Lake City, for respondent.

YETKA, Justice.

On July 31, 1978, appellant was charged with third-degree murder (Minn.Stat. § 609.195 (1980)) and first-degree manslaughter (Minn.Stat. § 609.20 (1980)) in connection with the June 1, 1978, death of his three-month-old son Michael. The case was tried to a jury in November 1978, in Wabasha County District Court, resulting in a verdict of guilty of third-degree murder. On March 9, 1979, appellant was sentenced to a maximum term of 15 years. This appeal followed. We affirm.

The issues raised on appeal are:

1. Whether the trial court erred in admitting testimony as to appellant's background and personality traits used to prove he fit the diagnosis of a "battering parent";

2. Whether the state should have been required to provide the defense with a pretrial *Spreigl* notice of its intent to establish the applicability of the "battering parent" and "battered child" syndromes;

3. Whether it was improper for the prosecutor to inquire of appellant's wife as to whether appellant had told her that he had beaten their son; and

4. Whether the trial court erred in submitting the third-degree murder charge to the jury and, if not, whether it erred in defining that crime.

The victim, Michael Loebach, was born February 13, 1978. His mother, Anna, who had been serving in the U. S. Army in Georgia, was pregnant with Michael when she met appellant, who was also serving in the U. S. Army. She and appellant were married a month before the baby was born. Anna was discharged in December because of her pregnancy. Appellant received a general discharge in early March. In late March of 1978, they began living in an apartment building in Millville, Minnesota, where Anna's half-sister lived.

Both appellant and Anna looked for jobs, but only Anna was successful. She began work as a waitress in Rochester in mid-April. Because appellant remained unemployed, he acted as the babysitter whenever Anna worked. With one exception, the baby was in the custody and presence of either or both Anna and appellant during his entire short life. The one exception was in April, when appellant and Anna took a weekend trip and left the baby with Anna's half-sister. It was undisputed that the baby was not injured in any way on that occasion. The evidence was clear that the baby had no "accidents" and showed no bruises before Anna began leaving him in appellant's care while she worked.

Anna's half-sister, Laurel Hermanson, testified that late in April she saw a serious bruise on the baby's chin which followed the jawbone all the way to the end of the jawline. She testified, as did Anna, that appellant's explanation was that he had accidentally dropped the baby when he was bathing it and that the baby's chin had hit the tub.

Mrs. Hermanson testified that on another occasion, in early May, Anna brought the baby over to her and asked her, "Do babies get like this?" She testified that the baby had a bruised face, marks on his head, and looked terrible. She told Anna that babies don't get like that and she confronted appellant, asking him if he had hurt the baby. When appellant denied having done anything to hurt the baby, she told him they should take the baby to the clinic and that they should be prepared to answer questions because the doctor would certainly want an explanation. The baby was never taken to the clinic.

There was also testimony that the baby had numerous facial scratches, head bumps and black eyes during this period, but the explanation by both Anna and appellant was that the baby scratched himself a lot, bumped his head on the crib, and poked his eye until it was black and blue. Anna also admitted that she saw appellant "spank" the baby once.

In addition to the testimony of Mrs. Hermanson, who did not see Anna or the baby after May 15, and the reluctant testimony of Anna, the jury also heard the testimony of one of the neighbors in the apartment building. The neighbor testified that when Anna was gone and appellant was caring for the baby, he heard the baby crying, heard a slapping sound, and then heard appellant saying, "Now you stop that!"

The baby died sometime on the evening of June 1, 1978, when Anna was at work and appellant was in charge. The testimony of a number of appellant's neighbors who visited with appellant in the hall that evening was that appellant was drinking and was unusually sociable. One of these neighbors, Mrs. Lori Stock, went in to look at the baby around 8:00 or 8:30 p. m. that evening while appellant and Mr. Stock were talking. She testified that she put her hand on the baby, who was lying on his abdomen with his head facing the wall, but did not notice anything unusual. Mrs. Stock testified that she did not touch the

baby for more than a moment because appellant came in and asked her to leave because he didn't want her to wake the baby. Sometime around 11:00 p. m., Anna arrived home but could not get into the apartment. Her loud pounding on the door failed to wake appellant. With the help of neighbors, Anna was able to get into the apartment through a window. Anna testified that when she got in, she found appellant asleep on the bathroom floor. She apparently checked the baby when she first arrived but did not notice anything wrong. When she checked the baby again at midnight, she noticed how cold he was and immediately knew that he was dead. She then ran out to the neighbors for help. The baby was in the same position he had been in when Mrs. Stock saw him at 8:00 or 8:30 that evening. There is strong medical evidence that the baby was dead by 9:00 p. m., possibly even when Mrs. Stock touched him sometime before that hour.

There is a conflict in the testimony of people who observed appellant and Anna shortly after the baby's death was discovered. Some testified that appellant was shook up and upset; others testified that his behavior was strange and inappropriate—for example, that he was cool, did not seem remorseful, expressed unusual concern about an ashtray, and turned on the stereo when the undertaker arrived.

A sheriff's deputy testified that appellant, who was obviously intoxicated, told him when he arrived that the baby had not been acting right, had not taken milk, and had died of crib death. Concerning bruises on the baby, appellant said he must have squeezed Michael too hard and that when he was giving the baby a bath, the baby must have slipped out.

The coroner, a licensed physician, testified that he immediately noticed an unusual bruise high on the baby's cheek near the temple and some 2- or 3-day-old bruises on the baby's back. Further, he testified that as he examined the baby, appellant interjected, in explanation of the bruises, that he had tossed the baby in the air playfully and that when he caught it, his fingernails had caused the back bruises. Both appellant and Anna objected when the doctor stated that he was ordering an autopsy. One witness testified that appellant was enraged by this.

The autopsy revealed back bruises, several bruises above one ear, one bruise on the jaw, and one between the nipples. The internal examination revealed 2- or 3-week-old rib fractures close to the spine. It also revealed that although there was no skull fracture, there was extensive brain hemorrhaging, some of which was caused by injuries occurring within the previous 24 hours and some by injuries 3 or more weeks old. It was determined that the hemorrhaging caused the death and that the injuries which caused the hemorrhaging were caused by some blunt force.

Appellant, in an interview by an investigator, repeated his version of the cause of the back bruises, claiming this incident occurred 2 to 3 days before the baby's death. Appellant also claimed that the baby often picked at his eye and even hit himself on the head. He admitted shouting at the baby if it cried, admitted spanking the baby, and admitted slapping it once in Georgia. The investigator testified that Anna said she occasionally noticed spots on the baby's head and that appellant's explanation was that the baby poked himself. The investigator also testified that Anna admitted asking appellant on two or three occasions if he had abused the baby and that Anna said his reply, which she believed, was that he had not.

Dr. Robert ten Bensel, an expert on child abuse, testified concerning the so-called "battered child syndrome." He concluded that it fit this case almost perfectly. The baby had not thrived and there were no organic reasons for this disclosed by the autopsy. The baby was in the 95th percentile by weight when born, but in only the 10th percentile at death; it was in the 95th percentile by height when born, but in only the 50th at death. At death, the baby had multiple bruises and injuries of different parts of the body, including the head. These injuries were both old and new. Dr.

ten Bensel testified that he had never before seen rib fractures like those revealed by the autopsy. He testified that the fractures were so close to the spine that it would require almost total compression of the ribs and total squeezing of the body to cause these injuries. He also testified that throwing the baby in the air and catching it could not have caused such fractures. As for the hemorrhaging, some were 1 to 3 weeks old and some had occurred within 24 hours of death. The fresh bleeding was the result of multiple blows. The multiple injuries were clearly not caused by accidents of the kind the defendant stated and were not self-inflicted. Dr. ten Bensel was firmly convinced that the baby's death was the final result of nonaccidental physical abuse of the baby over a period of time.

Dr. ten Bensel also was permitted to testify, over a general objection by defense counsel, that battering parents tend to have similar personality traits and personal histories.

Defense counsel objected generally to the state's calling of two witnesses from appellant's past in an attempt to prove appellant fit the pattern of a "battering parent." Judith Carpenter is a former case worker who was assigned to appellant when he was a juvenile in Illinois. She testified that appellant's mother, who raised appellant alone, had abused him until he was old enough to fight back, that his mother expected too much of him, and that appellant was not good at controlling his anger. Charles Nelson, an employee of a school for disturbed adolescent boys which appellant attended for 3 years until he reached age 18, testified that appellant often withdrew from others, had a low frustration level, and was adolescent in behavior. Testimony from other witnesses also aided in showing that appellant fit the "battering parent" profile. There was testimony that appellant and Anna were isolated and did not have contact with many people and that in April 1978, appellant had slapped her and broken her nose. Defense counsel did not object to the testimony concerning the broken nose.

The defense strategy for countering this testimony was partly to show that the "battering parent" profile also fit Anna and that it did not necessarily fit appellant. In cross-examining Anna's sister, defense counsel elicited testimony that appellant was proud, confident and not lacking in self-esteem, whereas Anna was hypertense, unable to cope, unable to handle liquor, and was herself a victim of child abuse. Appellant's direct testimony, however, tended to corroborate the state's evidence that he fit the profile. He testified that his mother called him the man of the family and that he developed a bad temper.

Appellant denied abusing the baby. He testified that he did not see anyone else abuse the baby and that he had no explanation for the injuries the doctor found in the autopsy, although he thought he might have broken the baby's ribs when he accidently dropped the baby one day. He also testified that for a period of time, until warned by Mrs. Hermanson that it was dangerous, he had playfully thrown the baby high in the air and caught it. He testified that he stopped doing this 1 to 2 months before the baby died. He also testified that while he admitted slapping the baby once, the slap was more like a love pat.

1. Appellant contends that the state's use of evidence of his character constitutes prejudicial error and warrants reversal. The specific testimony objected to concerns that given by the state's expert, Dr. ten Bensel, and the two prosecution witnesses who knew appellant as an adolescent.

On direct examination, Dr. ten Bensel was asked to state the characteristics of a "battering parent." According to Dr. ten Bensel, the "battering parent" syndrome is an "inner [sic] generational phenomena" in that adults who abuse their children were often abused themselves. The doctor testified that abusing parents frequently experience role reversal and often expect their children to care for them. He also stated that battering parents often exhibit similar characteristics such as low empathy, a short fuse, low temper, short temper, low boiling

point, high blood pressure, strict authoritarianism, uncommunicativeness, low self-esteem, isolation and lack of trust. Dr. ten Bensel did not testify that appellant possessed any of these characteristics, but the state's witnesses, Judith Carpenter and Charles Nelson, suggested that he did.

The obvious purpose for the introduction of the Carpenter and Nelson testimony and other character evidence was to demonstrate that appellant fit within the "battering parent" profile. The general rule as to the admission of such character, evidence is contained in Minn.R.Evid. 404(a) which provides in relevant part as follows:

(a) *Character evidence generally.* Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

(1) *Character of accused.* Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same;

* * *.

Appellant did not put his character in evidence in this case so the cited exception to the rule's general prohibition does not apply. *See State v. Martin,* 256 N.W.2d 85 (Minn.1977); *State v. Sharich,* 297 Minn. 19, 209 N.W.2d 907 (1973); Fed.R.Evid. 404(a).

Even prior to the adoption of the Minnesota Rules of Evidence by this court, the general prohibition against the use of character evidence was well established in Minnesota. In *City of St. Paul v. Harris,* 150 Minn. 170, 184 N.W. 840 (1921), the long history of the rule was recognized by the court when it noted, "No rule of criminal law is more thoroughly established than the rule that the character of the defendant cannot be attacked until he himself puts it in issue by offering evidence of his good character." *Id.* at 171, 184 N.W. at 840; *see State v. McCorvey,* 262 Minn. 361, 114 N.W.2d 703 (1962); *State v. Nelson,* 148 Minn. 285, 181 N.W. 850 (1921).

■ There are three basic reasons for the exclusion of character evidence used to prove a criminal defendant· acted in conformity with such character. First, there is the possibility that the jury will convict a defendant in order to penalize him for his past misdeeds or simply because he is an undesirable person. Second, there is the danger that a jury will overvalue the character evidence in assessing the guilt for the crime charged. Finally, it is unfair to require an accused to be prepared not only to defend against immediate charges, but also to disprove or explain his personality or prior actions. *State v. Spreigl,* 272 Minn. 488, 139 N.W.2d 167 (1965); 2 Louisell & Mueller, *Federal Evidence* § 136 (1978); 1 J. Wigmore, *Evidence* §§ 193–94 (3d Ed. 1940). Justice Jackson, in *Michelson v. United States,* 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948), recognized the nature and extent of the potential prejudice to a defendant generated by character evidence. In a widely cited opinion he stated the reasons for exclusion of character evidence as follows:

Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt. Not that the law invests the defendant with a presumption of good character, . . . but it simply closes the whole matter of character, disposition and reputation on the prosecution's case-in-chief. The state may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice.

*Id.* at 475–76, 69 S.Ct. at 218–19 (citation and footnotes omitted).

The state argues that the potential for prejudice to defendants that justifies the rule excluding character evidence is outweighed by the public interest in assuring conviction of persons who batter children. The state's position is that the difficulties involved in prosecuting those who abuse children warrant an exception to the general rule. The victim, as the state's expert testified, is usually an infant and therefore particularly defenseless. Children who are abused are also almost wholly dependent on those who inflict the abuse. The victims' age and dependence act to prevent them from testifying against abusing caretakers. Finally, abuse almost always occurs when the child is in the exclusive care of a battering caretaker. These features of abuse cases make it very difficult to establish a defendant's guilt by means of direct evidence. The state contends, therefore, that an exception to the general rule is necessary to offset these obstacles to the prosecution of battering individuals.

In *State v. Loss*, 295 Minn. 271, 204 N.W.2d 404 (1973), the court was not directly confronted with the issue of the propriety of "battering parent" evidence, but rather with a sufficiency of the evidence question. What might be construed as approving that doctrine was simply dictum. In *State v. Goblirsch*, 309 Minn. 401, 246 N.W.2d 12 (1976), the court determined that "battering parent" evidence was not an indispensable element of the state's case in a prosecution arising from child abuse, but held it was not reversible error to receive it into evidence.

■ We now hold that in future cases the prosecution will not be permitted to introduce evidence of "battering parent" syndrome or to establish the character of the defendant as a "battering parent" unless the defendant first raises that issue. We feel this finding is required until further evidence of the scientific accuracy and reliability of syndrome or profile diagnoses can be established.

■ Our determination that the "battering parent" evidence should not have been admitted does not affect the result of this case in the court below. A defendant claiming error in the trial court's reception of evidence has the burden of showing both the error and the prejudice resulting from the error. *Lowe v. United States*, 389 F.2d 108 (8th Cir.), *cert. denied*, 392 U.S. 912, 88 S.Ct. 2072, 20 L.Ed.2d 1371 (1968). A reversal is warranted only when the error substantially influences the jury to convict. *State v. Carlson*, 268 N.W.2d 553 (1978).

The record in this case indicates that the "battering parent" testimony consisted of only a small percentage of the evidence. The record also reveals that there was overwhelming evidence of appellant's guilt even without the "battering parent" testimony.

Various bruises and other injuries were observed on the baby prior to its death. The baby was in the exclusive care of appellant for a considerable amount of time. Appellant's statements as to how the baby was injured were inconsistent with the physical evidence and his earlier versions of what occurred. Appellant's wife did observe him spanking the victim, a 3-month-old baby, on one occasion. Testimony from a neighbor suggested that on another occasion appellant slapped and yelled at the baby. Appellant admitted that he slapped and spanked the baby at different times.

The physical evidence of abuse was substantial. There were bruises of different ages, head injuries, rib fractures of different ages, and brain hemorrhaging of different ages. The baby's weight and growth were not consistent with normal development. The state's expert testified that the baby's injuries could not have been sustained in the manner appellant claimed. It was the opinion of the state's expert that the child died as a result of battered child syndrome.

In light of this substantial evidence to support appellant's conviction, the error in admitting "battering parent" testimony was not prejudicial.

2. Appellant also contends that the defense should have been provided with a

pretrial *Spreigl*-type notice[1] of the state's intent to use "battering parent" and "battered child" syndrome evidence.

■ Since we have determined that in future cases "battering parent" testimony may not be used unless the defendant first places his character in issue, we need not decide whether a pretrial notice should be required for that type of evidence. It is significant to note that in this case the defense had actual notice that the issue of whether appellant was a battering parent would be raised; therefore, there was no prejudice to appellant from the lack of such notice.

■ There also appears to be no reason to require notice of intent to use "battered child syndrome" evidence. Much of that type of testimony is gleaned from an autopsy or other medical reports presently admissible without notice. In addition, defense counsel is provided adequate notice of expert testimony under the Rules of Criminal Procedure, and the substance of such testimony can be obtained through the discovery process.

3. Appellant further argues that the state improperly examined appellant's wife. She was called as an adverse witness by the state and was cross-examined by the prosecutor as follows:

Q Did you beat your son and cause his death?

A No, I did not.

Q Did the defendant ever tell you he did?

A No.

Appellant objected to this inquiry at trial on the ground that since the state had no reason to believe appellant had ever confessed to the crime, this question, that implied appellant may have confessed, was improper.

In *State v. Sharich*, we noted that:

[I]nquiries which assume the existence of damaging facts may be phrased in such manner and asked with such persistence as to impress the jury that an inference should be drawn as to their truth even though the defendant denies it and there is no other evidence to support it. Such inquiries are improper.

297 Minn. at 24, 209 N.W.2d at 911; *see State v. Eaton*, 292 N.W.2d 260 (Minn.1980); *State v. Lindsey*, 284 N.W.2d 368 (Minn. 1979); *State v. Stofflet*, 281 N.W.2d 494 (Minn.1979); *State v. Flowers*, 262 Minn. 164, 114 N.W.2d 78 (1962).

■ There are a number of reasons why the question the prosecutor asked of appellant's wife does not warrant a reversal. First, the questions and testimony preceding the inquiry were related to the baby's injuries and appellant's explanations of those injuries to his wife. The question merely asked whether appellant had given a particular explanation. Second, the question did not suggest an answer to the witness, nor was it argumentative. Third, the question was asked only on a single occasion and there were no other inquiries with respect to an admission by appellant of his involvement in the child's death. Finally, the state did not attempt to dispute the truth of the witness' response. All of these elements suggest that this question was not the type the *Sharich* court intended to prohibit. Accordingly, appellant's argument on this point is rejected.

4. Appellant's final contention is that the trial court not only erred in its instructions on third-degree murder, but should not even have submitted a third-degree murder charge to the jury.

■ Appellant's argument, that the submission of the third-degree murder charge was improper because the "merger doctrine" prevents the use of aggravated assault as an underlying felony, is an argument which has been made countless times by other defendants and rejected each time by this court. *See, e. g., Kochevar v. State*, 281 N.W.2d 680 (Minn.1979). Appellant has not persuaded us to stray from such precedent.

1. *State v. Spreigl*, 272 Minn. 488, 139 N.W.2d 167 (1965).

Appellant's next argument is that since third-degree murder and first-degree manslaughter are legally indistinguishable, only the lesser offense should have been submitted. It is true that the two are only narrowly distinguishable. As a result of this court's recent opinion in *State v. Adams*, 295 N.W.2d 527 (Minn.1980), however, the prosecutor was not required to charge appellant with the lesser offense of first-degree manslaughter, and the trial court was not required to submit it. Thus, if anything, appellant benefited from the submission of the less onerous first-degree manslaughter charge.

The conviction is affirmed.