*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A25-0144**

State of Minnesota,
Respondent,

vs.

Jaisden Harold-Dru Hanners,
Appellant.

**Filed February 23, 2026
Affirmed in part, reversed in part, and remanded
Halbrooks, Judge**[*]

Redwood County District Court
File No. 64-CR-23-416

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Shannon M. Ness, Redwood County Attorney, Redwood Falls, Minnesota; and

Travis J. Smith, Special Assistant County Attorney, Slayton, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Jessica Merz Godes, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Ede, Presiding Judge; Larson, Judge; and Halbrooks, Judge.

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**HALBROOKS**, Judge

A Redwood County jury found appellant guilty of five counts of second-degree criminal sexual conduct based on evidence that he had sexual contact with his stepdaughter numerous times while she was between 10 and 12 years of age. Appellant challenges his conviction, arguing (1) for reversal on the ground that the district court plainly erred by allowing expert testimony about grooming behavior and (2) for remand to correct the sentencing order and warrant of commitment. We affirm appellant's conviction but reverse and remand the sentencing order and warrant of commitment for correction by the district court.

## FACTS

Between April 2016 and April 2017, appellant Jaisden Harold-Dru Hanners sexually abused his stepdaughter R.G. numerous times while she was between 10 and 12 years old. Due to challenges related to substance use, R.G.'s mother was often absent—either imprisoned or undergoing residential treatment. Hanners perpetrated much of his abuse during these prolonged absences. On one occasion, R.G. woke up to find Hanners in bed with her with his hand on her breast area and his erect penis pressed against her clothed buttocks. On another occasion, R.G. woke up to find Hanners in bed with her touching her buttocks and vagina underneath her clothing with his hand. Hanners told R.G. not to tell her mother about the incident. On several occasions, Hanners placed R.G. on his lap while he had an erection, pushed her against his groin, and swayed back and forth. On another occasion, Hanners sucked on R.G.'s ear.

Hanners also made numerous sexually explicit comments to R.G., including describing how to masturbate, often referring to R.G. as "sexy," and telling her sexually explicit jokes. Hanners also gave R.G. drugs and alcohol on various occasions, including wine, cannabis, and gabapentin. R.G. testified that the drugs and alcohol caused her to black out and have lapses in memory. Hanner's abuse caused R.G. to engage in self-harm, attempt suicide, and require hospitalization.

In the fall of 2019, R.G. disclosed Hanners's abuse to her mother, her grandmother, and a school counselor. In November 2020, R.G. was interviewed by a social worker about the abuse and, in December, she participated in a forensic interview at a child advocacy center. The child advocacy center contacted law enforcement, which opened an investigation into Hanners.

In June 2023, respondent State of Minnesota charged Hanners with seven counts of criminal sexual conduct: three counts of second-degree criminal sexual contact of a person under 13 years old by an actor more than 36 months older than that person, in violation of Minn. Stat. § 609.343, subd. 1(a) (2014), 1(a) (2016); three counts of second-degree criminal sexual contact of a person under 16 years old by an actor in a significant relationship with that person, in violation of Minn. Stat. § 609.343, subd. 1(g) (2014); one count of second-degree criminal sexual contact of a person under 16 years old involving multiple acts over an extended period of time by an actor in a significant relationship with that person, in violation of Minn. Stat. § 609.343, subd. 1(h)(iii) (2014).

In October 2023, the state provided notice of intent to introduce expert testimony to explain victim behaviors in domestic-violence situations. In July 2024, the state moved

the district court in limine to allow the Redwood County Sheriff to provide expert testimony concerning counter-intuitive victim behaviors. The state also moved for admission of evidence related to domestic abuse by Hanners against R.G. and her mother under Minn. Stat. § 634.20 (2022).[1] Hanners moved in limine to exclude the expert testimony arguing that disclosure was untimely and insufficient under Minn. R. Crim. P. 9.01. The district court held a hearing on the pretrial motions. At the hearing, the state substituted a new expert witness, added that she would address grooming behavior, and argued for her certification. Hanners objected to admission of the expert witness's testimony, arguing that disclosure was untimely and insufficient. The district court took the issue under advisement.

A week after the hearing, the district court issued a pretrial order granting the state's request to admit expert testimony on victim behavior, but deferred ruling on whether to admit testimony about grooming behavior until the court ruled on admission of the

---

[1] Minn. Stat. § 634.20 provides:

> Evidence of domestic conduct by the accused against the victim of domestic conduct, or against other family or household members, is admissible unless the probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issue, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. "Domestic conduct" includes, but is not limited to, evidence of domestic abuse, violation of an order for protection under section 518B.01; violation of a harassment restraining order under section 609.748; or violation of section 609.749 or 609.79, subdivision 1. "Domestic abuse" and "family or household members" have the meanings given under section 518B.01, subdivision 2.

Minn. Stat. § 634.20 evidence. The district court reserved ruling on the Minn. Stat. § 634.20 evidence until the state identified with specificity the instances of domestic abuse it intended to introduce.

Before jury selection, the district court heard arguments on admission of the Minn. Stat. § 634.20 evidence and whether to allow expert testimony about grooming behavior. The state argued that the court should allow evidence of instances when Hanners sexually groomed R.G., arguing that such evidence was admissible under Minn. Stat. § 634.20 and relevant for establishing intent. The state argued that expert testimony about grooming behaviors would help the jury understand Hanners's intent and behavior over time. The district court deferred ruling on whether to admit expert testimony related to grooming behavior until after hearing R.G.'s testimony, reasoning that hearing R.G.'s testimony would enable it to determine whether expert testimony on grooming behavior would be helpful to the jury.

Hanners's case was tried to a jury over three days. Prior to opening statements, the district court granted the state's motion to admit evidence under Minn. Stat. § 634.20. However, the district court limited the evidence to "sexually manipulative or grooming-type activity," which the district court reasoned "most clearly puts the alleged crime in the context of a relationship."

The state called 11 witnesses, including R.G.; R.G.'s mother, grandmother, and grandfather; a social worker; two forensic interviewers; a police officer; the probation officer assigned to R.G.'s mother; the investigating officer; and the expert witness. Hanners exercised his right to remain silent and called no witnesses.

5

Following R.G.'s testimony, the state renewed its motion to admit expert testimony about grooming behavior. Hanners again objected on relevance grounds. The district court admitted the expert witness's testimony related to grooming behaviors.

On the last day of trial, the state's expert witness testified about grooming behaviors. During closing argument, the prosecutor went through the elements of each charge and argued that the state had proven each element beyond a reasonable doubt, summarizing R.G.'s testimony and corroborating testimony in detail. The prosecutor discussed the expert witness's testimony about grooming behavior in the context of explaining why R.G. maintained a relationship with Hanners during and after the abuse and did not disclose the abuse for several years.

The jury found Hanners guilty of five counts of second-degree criminal sexual conduct, in violation of Minn. Stat. § 609.343, subd. 1(a), (g), (h)(iii), but found him not guilty of two counts of second-degree criminal sexual conduct, in violation of Minn. Stat. § 609.343, subd. 1(a), (g).

Hanners moved the district court for a downward dispositional departure. At sentencing, the district court denied the dispositional-departure motion, adjudicated Hanners guilty of count 7—second-degree criminal sexual conduct, in violation of Minn. Stat. § 609.343, subd. 1(h)(iii)—and sentenced Hanners to 90 months of imprisonment. The district court declined to "pronounce any sentence on the remaining counts" but did "preserve the jury's finding of guilt on those offenses."

In November 2024, the district court issued a sentencing order and warrant of commitment. The order and warrant of commitment indicated that Hanners had been acquitted of charges 1-2 and convicted of charges 3-7.

This appeal follows.

**DECISION**

Hanners raises two issues on appeal. First, Hanners argues that he is entitled to a new trial because the district court plainly erred by allowing the state to elicit expert testimony about how offenders groom victims. Second, Hanners argues that the sentencing order and warrant of commitment must be corrected because they erroneously indicate that he was convicted of five counts when the district court only entered judgment on one count.

**I.**

Hanners argues that the district court plainly erred by allowing the state to elicit expert testimony about how offenders groom victims, that this error affected his substantial rights, and that the fairness and integrity of judicial proceedings require a new trial.

Minnesota Rule of Evidence 702 governs the admissibility of expert testimony and provides that an expert may give their opinion if their "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." "[E]xpert testimony is admissible under Minn. R. Evid. 702 when it is helpful to the jury." *State v. Obeta*, 796 N.W.2d 282, 289 (Minn. 2011). "[E]xpert testimony is not helpful if the expert opinion is within the knowledge and experience of a lay jury and the testimony of the expert will not add precision or depth to the jury's ability

7

to reach conclusions." *State v. Sontoya*, 788 N.W.2d 868, 872 (Minn. 2010) (quotation omitted).

This court reviews evidentiary rulings, "including those related to the admissibility of expert testimony, for an abuse of discretion." *State v. Thao*, 875 N.W.2d 834, 840 (Minn. 2016). The admission of expert testimony is an abuse of discretion when the district court's ruling is "based on an erroneous view of the law or is against logic and the facts in the record." *State v. Heller*, 12 N.W.3d 452, 466 (Minn. 2024) (quotation omitted). However, appellate courts generally "will not consider a challenge to the admission of evidence 'unless . . . a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context.'" *State v. Rossberg*, 851 N.W.2d 609, 617-18 (Minn. 2014) (quoting Minn. R. Evid. 103(a)(1)). In cases where an appellant objected to admission of evidence on one ground, and appeals admission of evidence on another ground that was not apparent from the context, appellate courts apply the plain-error test. *See id.*

While Hanners did object to admission of the expert testimony on the grounds that its disclosure was untimely, insufficient, not relevant, and confused the issues, Hanners concedes that he did not object on the ground that the testimony constituted improper profile evidence. Accordingly, we apply the plain-error test. *Id.*

Under the plain-error test, an appellant is entitled to relief on an issue to which no objection was made at trial only if (1) there is an error, (2) the error is plain, and (3) the error affects the appellant's substantial rights. *State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998). If these three requirements are satisfied, the appellant also must satisfy a

fourth requirement: that the error "seriously affects the fairness and integrity of the judicial proceedings." *State v. Little*, 851 N.W.2d 878, 884 (Minn. 2014). If an appellate court concludes that any requirement of the plain-error test is not satisfied, the appellate court need not consider the other requirements. *State v. Brown*, 815 N.W.2d 609, 620 (Minn. 2012).

**A.**

The first step in the analysis is to determine whether the district court erred. *See Griller*, 583 N.W.2d at 740. Hanners does not distinguish between the error and plain-error prongs of the plain-error test. Instead, he combines the two prongs, contending that the district court plainly erred by allowing the expert witness to testify about grooming behavior because the testimony was related to how offenders, rather than victims, act. According to Hanners, such testimony was improper because it contravenes caselaw prohibiting testimony intended to cause a jury to infer that, because a defendant's conduct fits the profile of a typical offender, the defendant must be guilty.

In *State v. Williams*, the supreme court reversed Williams's conviction for first-degree controlled-substance crime for possessing more than ten grams of cocaine with intent to sell and remanded for a new trial. 525 N.W.2d 538, 540 (Minn. 1994). The state offered testimony about a "'drug-courier profile' used by drug investigators at airports, train stations and bus terminals to help spot drug couriers" and "[t]estimony describing how [Williams's] conduct . . . fit the profile." *Id.* at 541. The supreme court determined that the testimony of officers about how "in their experience most drug couriers behave a certain way" was "clearly and plainly inadmissible." *Id.* at 548. The supreme court

9

observed that "evidence that a defendant has traits shared by those who in the past have acted as drug couriers seems akin to character evidence." *Id.* at 547 (quotation omitted). The supreme court concluded that the prosecuting attorney committed misconduct "in eliciting the inadmissible evidence that [Williams] fit a drug courier profile used by the officers" and that this error, combined with others, deprived Williams of a fair trial. *Id.* at 549.

Similarly, in *State v. Loebach*, the supreme court rejected expert evidence about "battering parent" syndrome offered during Loebach's trial for third-degree murder. 310 N.W.2d 58, 59, 64 (Minn. 1981). At trial, an expert "was asked to state the characteristics of a 'battering parent.'" *Id.* at 62. Although the expert "did not testify that [Loebach] possessed any of these characteristics," the "obvious purpose" of other state witnesses' testimony "was to demonstrate that [Loebach] fit within the 'battering parent' profile." *Id.* at 63. The supreme court determined that "the 'battering parent' evidence should not have been admitted." *Id.* at 64.

But the supreme court determined that the error "was not prejudicial" because "there was overwhelming evidence of [Loebach's] guilt even without the 'battering parent' testimony," which was "only a small percentage of the evidence." *Id.* The supreme court stated that "in future cases the prosecution will not be permitted to introduce evidence of 'battering parent' syndrome" until "further evidence of the scientific accuracy and reliability of syndrome or profile diagnoses can be established." *Id.*

Recently, in *State v. Heller*, the supreme court clarified its holdings in *Williams* and *Loebach*, noting "evidence that a defendant fits a certain profile is a type of evidence where

10

the unfair prejudice to the defendant outweighs the probative value of the evidence." 12 N.W.3d 452, 466 (Minn. 2024). In *Heller*, the supreme court held that expert testimony about "lethality factors" is inadmissible because "as in *Williams* and *Loebach*, the jury was impliedly urged to infer that since defendant's conduct fit the profile, the defendant must have been guilty." *Id.* at 467 (quotation omitted). According to the supreme court, such testimony creates a narrative that the defendant committed the crime against the victim because people like the defendant tend to commit such crimes against people like the victim. *Id.*

Here, as in *Loebach*, a good portion of the expert testimony about grooming had much more to do with offender behavior than child-victim behavior. The expert witness discussed five stages of grooming, including victim selection, establishing access, building trust, desensitizing the victim, and maintaining secrecy. The only portion of this testimony that related primarily to victim behavior was about maintaining secrecy. The rest of the grooming testimony related primarily to offender behavior. Additionally, the prosecutor asked the expert witness if specific conduct—including talking about sex with a child, describing sexual acts to a child, and complimenting a child about their body—was consistent with grooming behavior.

While the prosecutor did not tell the expert witness that Hanners committed these acts, R.G. had earlier testified in the presence of the jury that Hanners did these things to her. The expert witness's testimony also made clear that grooming behavior leads to sexual abuse. Thus, because the expert witness affirmed that acts that the jury heard Hanners committed against R.G. constitute grooming behavior and because the expert witness

11

clearly suggested that people who engage in grooming behavior are seeking to sexually abuse those they groom, "as in *Williams* and *Loebach*, the jury was impliedly urged to infer that since defendant's conduct fit the profile, the defendant must have been guilty." *Heller*, 12 N.W.3d at 467 (quotation omitted). Therefore, we conclude that the district court erred by allowing the expert witness to testify as to grooming behaviors.

**B.**

Having concluded that the district court erred, we next determine whether the district court's error was plain. *See Griller*, 583 N.W.2d at 740. "An error is plain if it is clear or obvious, which is typically established if the error contravenes case law, a rule, or a standard of conduct." *State v. Webster*, 894 N.W.2d 782, 787 (Minn. 2017) (quotations omitted). "An alleged error does not contravene caselaw unless the issue is conclusively resolved." *State v. Hollins*, 765 N.W.2d 125, 133 (Minn. 2009) (quotation omitted).

Here, while admission of the expert witness's testimony was error under the principles of *Williams*, *Loebach*, and *Heller*, the issue of whether expert testimony about grooming behavior should be admissible has not been conclusively established. Indeed, two nonprecedential decisions of this court come to opposite conclusions on the issue.[2] In *State v. Standifer*, we concluded that expert testimony about grooming behavior, among other things, "was helpful to the jury in considering the [victim]'s testimony." No. A10-1018, 2011 WL 2672025, at *3 (Minn. App. July 11, 2011), *rev. denied* (Minn. Sept. 28, 2011). But in *State v. Pike*, we concluded that, while expert testimony describing typical

---

[2] Nonprecedential opinions are not binding authority but may be cited as persuasive authority. *See* Minn. R. Civ. App. P. 136.01, subd. 1(c).

behaviors of child sexual-abuse victims was admissible, it was error to allow testimony about the grooming behavior of "typical" abusers. No. A23-0680, 2024 WL 3249296, at *6 (Minn. App. July 1, 2024), *rev. denied* (Minn. Oct. 30, 2024). Absent binding precedent, we cannot say that the issue has been conclusively resolved. *See Hollins*, 765 N.W.2d 125, 133.

Additionally, unlike *Williams*, *Loebach*, and *Heller*, the context of the expert testimony about grooming in this case was directly related to helping the jury understand the relevant Minn. Stat. § 634.20 evidence. Having determined—after hearing R.G.'s testimony—that there were grooming behaviors contemporaneous with the alleged incidents that were relevant to the relationship between Hanners and R.G., the district court admitted the expert testimony. The court reasoned that such expert testimony would be helpful to the jury in understanding the relevant relationship evidence pertaining to Hanners and R.G. In other words, the district court determined that the expert testimony would assist the trier of fact to understand other admitted evidence. This is consistent with Minn. R. Evid. 702, and *Obeta*, 796 N.W.2d at 289. Because the district court admitted evidence about grooming behavior under Minn. Stat. § 634.20, we cannot say that the district court plainly erred by allowing an expert to explain grooming behavior to help the jury understand the admitted Minn. Stat. § 634.20 evidence. Therefore, we conclude that any error by the district court in allowing the expert witness's testimony was not plain.

## C.

Even if the district court's error was plain, we would not reach a different result because we conclude that the error did not affect Hanner's substantial rights. At the third

13

step of the plain-error test, an appellant bears a "heavy burden" in seeking to show that a plain error affected his substantial rights. *State v. Davis*, 820 N.W.2d 525, 535 (Minn. 2012). "A plain error affects the substantial rights of the defendant when there is a reasonable likelihood that the error substantially affected the verdict." *State v. Matthews*, 800 N.W.2d 629, 634 (Minn. 2011) (quotation omitted). Hanners bears the burden "to establish a reasonable possibility that the jury would have reached a different verdict had the wrongfully admitted testimony not come in." *State v. Jaros*, 932 N.W.2d 466, 472 (Minn. 2019). Hanners argues that the expert testimony about grooming behavior affected his substantial rights because it improperly bolstered R.G.'s credibility while undermining his credibility.

We weigh several "[n]on-exclusive factors . . . to determine whether a reasonable possibility exists that the erroneously admitted evidence significantly affected the jury's verdict." *State v. Bigbear*, 10 N.W.3d 48, 54 (Minn. 2024) (applying harmless-error review); *see also Matthews*, 800 N.W.2d at 634 ("The court's analysis under the third prong of the plain error test is the equivalent of a harmless error analysis."). These factors include (1) the manner in which the party presented the evidence, (2) whether the evidence was highly persuasive, (3) whether the party who offered the evidence used it in closing argument, (4) whether the defense effectively countered the evidence, and (5) whether the evidence of guilt was strong. *Id.* at 54.

We first consider the manner in which the party presented the evidence. *Id.* at 56. In analyzing the manner of presentation, we seek to determine the prominence of the admitted evidence. *See id.* In analyzing the prominence of erroneously admitted evidence,

14

we consider, among other things, the relative number of transcript pages that the evidence occupies and whether the evidence was used throughout the state's case. *Id.*

Hanners argues the expert witness's testimony played a prominent role because it was the last testimony the jury heard, given that Hanners did not call any witnesses. Here, the expert testimony regarding grooming behavior formed only a part of the expert witness's testimony, encompassing 5 of 40 transcript pages. Additionally, the challenged testimony came from 1 of 11 witnesses and encompassed only 5 of more than 1,000 pages of trial transcript. This is less than the length of other testimony the supreme court has concluded to be insignificant. *See, e.g.*, *State v. Smith*, 940 N.W.2d 497, 506 (Minn. 2020) (concluding that inadmissible evidence was only a "small part of the State's presentation" because it spanned only 35 pages of 1,380-page trial transcript); *Bigbear*, 10 N.W.3d at 56 (concluding challenged evidence that spanned only 12 pages of the 300-page trial transcript was insignificant relative to whole trial).

Additionally, the evidence was not used by the state throughout the whole trial. In *State v. Al-Naseer*, the supreme court concluded that a video recording of the defendant's interview with police was prominent because the prosecutor mentioned it in the state's opening statement, closing argument, and on direct and cross-examination of witnesses to point out inconsistencies in the defendant's statements. 690 N.W.2d 744, 749-50 (Minn. 2005). In this case, unlike in *Al-Naseer*, the expert testimony was not mentioned in opening or in the examination of other witnesses and was mentioned only briefly in closing. Thus, even if the expert witness testimony about grooming behavior was plainly erroneous, this

15

factor weighs toward a determination that it did not affect Hanners's substantial rights because the evidence was not prominently presented.

Second, we consider whether the evidence was highly persuasive. *See Bigbear*, 10 N.W.3d at 57-59. Hanners argues that because the testimony about grooming behavior came from an expert witness, it was highly persuasive. While it is true that expert testimony is persuasive, the district court gave the jury instructions related to how it was to consider the relationship evidence the expert testimony was elucidating. Specifically, the district court stated that any testimony about grooming was

> offered for the limited purpose of demonstrating the nature and extent of the relationship between the defendant and [R.G.] in order to assist you in determining whether the defendant committed the acts with which the defendant is charged in this matter. The defendant is not being tried for and may not be convicted of any behavior other than the charged offenses. You are not to convict the defendant on the basis of conduct on other occasions. To do so might result in unjust double punishment.

Because the jury is presumed to have followed that instruction, any improper inference about the grooming behavior was mitigated. *See State v. Fardan*, 773 N.W.2d 303, 320 (Minn. 2009) (stating that juries are presumed to follow district court instructions). Thus, even if the expert testimony about grooming behavior was plainly erroneous, this factor weighs in favor of a determination that it did not affect Hanner's substantial rights.

Third, we consider whether, and to what extent, the disputed evidence was used in closing argument. *See Bigbear*, 10 N.W.3d at 59. Mere mention of erroneously admitted evidence in closing is not sufficient for an error to be reversible. *See id.* In *Bigbear*, the

16

court found improperly admitted evidence did not significantly affect the jury's verdict, even though the state mentioned the improper evidence nine times in closing argument. *Id.* In this case, the expert witness's testimony was discussed in closing argument, but relatively briefly. It encompassed 3 out of 52 transcript pages of the prosecution's closing argument and rebuttal. Additionally, the use in closing argument—explaining the relationship between Hanners and R.G.—was consistent with the purpose for which the district court admitted the expert witness's testimony. Thus, even if the expert testimony about grooming behavior was plainly erroneous, this factor weighs toward a determination that it did not affect Hanners's substantial rights because the expert testimony was only briefly used in closing argument and was used for its intended purpose.

Fourth, we consider whether Hanners was able to effectively counter the disputed evidence. *See id.* In *Bigbear*, the challenged evidence was a recording admitted at trial. 10 N.W.3d at 53-54. In that case, the defendant argued that he was unable to effectively counter the recording because the witness who was the subject of the recording did not remember enough to be effectively cross-examined. *Id.* at 59. Additionally, the defendant in *Bigbear* argued that, because the scope of the prosecution's direct examination of the witness did not include details from the recording, appellant was unable to question her about it. *Id.* The supreme court concluded that, even though the defendant countered the challenged evidence "to some extent" in cross-examination and in closing arguments, the defendant did not effectively counter the inadmissible evidence. *Id.* at 59.

In this case, unlike *Bigbear*, the challenged testimony was presented during the course of the prosecutor's direct examination of the expert witness. And Hanners was able

17

to extensively cross-examine the expert witness about the content of the challenged testimony. Accordingly, this factor weighs toward a determination that any inadmissible testimony did not affect Hanners's substantial rights.

Finally, we consider whether the evidence of guilt was strong. *Id.* at 59-60. Hanners contends that this case hinged on credibility and that the expert witness's testimony about grooming behavior undoubtedly damaged his credibility in the eyes of the jury. In this case, the evidence against Hanners was strong. R.G. testified that her mother was often away from home in either jail, prison, or treatment, and that the abuse often occurred when she was absent. R.G. testified very specifically about the abuse, including that on one occasion, she woke up to find Hanners in bed with her with his hand on her breast area and his erect penis pressed against her clothed buttocks. She stated that, on another occasion, she woke up to find Hanners in bed with her touching her buttocks and vagina underneath her clothing with his hand. R.G. testified that Hanners told her not to tell her mother about the incident. And R.G. testified that on more than one occasion Hanners placed her on his lap while he had an erection, pushed her against his groin, and swayed back and forth.

R.G.'s mother corroborated that she had been absent consistent with the times testified to by R.G. In addition, R.G.'s mother testified about R.G.'s 2019 disclosure, which matched R.G.'s testimony at trial. R.G.'s testimony was also consistent with the information she shared in the forensic interview she gave in 2020.

Ultimately, the jury acquitted Hanners of two counts and found him guilty of five counts. This suggests that the jury carefully weighed the evidence and was not unduly prejudiced against Hanners. *See State v. Washington*, 521 N.W.2d 35, 40 (Minn. 1994)

18

(reasoning where jury acquitted appellant of some counts, but convicted appellant of others, members of jury were not unduly prejudiced against the defendant).

After weighing the pertinent factors, we conclude that Hanners did not meet his burden of showing that there is a reasonable likelihood that the wrongfully admitted evidence significantly affected the verdict. Accordingly, even if the district court plainly erred, any such error did not affect Hanners's substantial rights.

**D.**

Even if the other prongs of the plain-error test are satisfied, this court will not exercise its limited discretion to grant relief to correct the error unless the "failure to do so will cause the public to seriously question the fairness and integrity of our judicial system." *Pulczinski v. State*, 972 N.W.2d 347, 359 (Minn. 2022). Here, Hanners was represented by counsel at trial, and the record demonstrates that Hanners's counsel was prepared and presented a vigorous defense. The record further demonstrates that the district court carefully considered disputed issues before it, including objections to evidence that were made before and during trial.

The jury carefully listened to the evidence, and after hearing the evidence, the parties' arguments, and the district court's instructions, the jury carefully deliberated and delivered thoughtful verdicts on the strength of the evidence for each charge. When that evidence was insufficient to meet the state's burden, the jury had no problem returning not-guilty verdicts. Given this record, it is not likely that any error would have wider ramifications and cause the public to seriously question the fairness and integrity of our

judicial system. Thus, any error did not likely affect the fairness and integrity of the judicial proceedings.

In sum, while it is likely that the district court erred by allowing the expert witness's testimony about grooming behavior, the error was not plain, did not affect Hanners's substantial rights, and did not seriously affect the fairness and integrity of the judicial proceedings. We, therefore, affirm Hanners's conviction.

## II.

Hanners also argues that the sentencing order and warrant of commitment erroneously indicates that he was convicted of five counts when the district court only entered judgment for one count. Hanners contends that his case must be remanded for the district court to correct this error. The state concedes that this case should be remanded to the district court to correct the warrant of commitment to accurately reflect what occurred at sentencing.

When a warrant of commitment conflicts with an orally pronounced sentence, the oral sentence controls. *State v. Staloch*, 643 N.W.2d 329, 331 (Minn. App. 2002). A district court may correct clerical errors in the warrant of commitment at any time. Minn. R. Crim. P. 27.03, subd. 10.

In this case, the jury found Hanners guilty of five counts of second-degree criminal sexual conduct in violation of Minn. Stat. § 609.343, subd. 1(a), (g), (h)(iii), but found him not guilty of two counts of second-degree criminal sexual conduct in violation of Minn. Stat. § 609.343, subd. 1(a), (g). At sentencing, the district court adjudicated Hanners guilty of one count of second-degree criminal sexual conduct in violation of

20

Minn. Stat. § 609.343, subd. 1(h)(iii), and sentenced Hanners to 90 months of imprisonment. The district court declined to "pronounce any sentence on the remaining counts" but did "preserve the jury's finding of guilt on those offenses." But the order and warrant of commitment indicate that Hanners was acquitted of two counts and convicted of five counts. Because the warrant of commitment conflicts with the orally pronounced sentence, the warrant of commitment is incorrect.

Accordingly, we reverse the sentencing order and remand it to the district court with instructions to correct the order and warrant of commitment to reflect the fact that convictions were not entered on counts 3 through 6, and that the jury's guilty verdicts are retained. *See State v. LaTourelle*, 343 N.W.2d 277, 284 (Minn. 1984) (holding that "the proper procedure to be followed by the trial court when the defendant is convicted on more than one charge for the same act is for the court to adjudicate formally and impose sentence on one count only").

**Affirmed in part, reversed in part, and remanded.**